# No. 2016-1599

# United States Court of Appeals
# for the Federal Circuit

AYLUS NETWORKS, INC.,

*Plaintiff – Appellant,*

v.

APPLE INC.,

*Defendant – Appellee.*

*On Appeal from the United States District Court for the
Northern District of California in Case No. 3:13-cv-4700, Judge Edward M. Chen*

# NON-CONFIDENTIAL APPELLANT'S OPENING BRIEF

Joshua L. Sohn
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
777 Sixth St., NW, 11th Floor
Washington, DC 20001-3706
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Amar L. Thakur
Bruce R. Zisser
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa St., 10th
Floor
Los Angeles, CA  90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Appellant Aylus Networks, Inc.*
May 23, 2016

## **CERTIFICATE OF INTEREST**

Counsel for Plaintiff-Appellant Aylus Networks, Inc. certifies the following:

1.     The full name of every party represented by me is:  Aylus Networks, Inc. ("Aylus").

2.     Aylus is named in the caption and is the real party in interest.

3.     Aylus has no parent corporation and no publicly-held corporation owns 10% or more of Aylus' stock.

4.     The following law firms/attorneys have appeared (and/or are expected to appear) in the court below and/or in this Court on behalf of Aylus:

> <u>Quinn Emanuel Urquhart & Sullivan</u>:
> Amar L. Thakur
> Bruce Zisser
> Joshua L. Sohn
> Harold Barza
> Joseph B. Martin
> Vincent Pollmeier
> William Cooper

Dated: May 23, 2016                    Respectfully submitted,

By:  */s/ Amar L. Thakur*
　　　Amar L. Thakur
　　　QUINN EMANUEL URQUHART
　　　  & SULLIVAN, LLP
　　　865 South Figueroa Street, 10th Floor
　　　Los Angeles, California 90017
　　　Telephone: (213) 443-3000
　　　Facsimile: (213) 443-3100
　　　amarthakur@quinnemanuel.com

　　　*Attorneys for Appellant Aylus Networks, Inc.*

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................0

STATEMENT OF RELATED CASES ....................................................1

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .......................................................5

STATEMENT OF ISSUES ....................................................................5

STATEMENT OF THE CASE.................................................................6

      A.     The Asserted Patent.........................................................6

      B.     The Accused Process........................................................10

      C.     The *Inter Partes* Review Proceedings and the Narrowing of the Case to Claims 2 and 21 ....................................................11

      D.     The District Court's Summary Judgment Order .................14

SUMMARY OF ARGUMENT ...............................................................16

STANDARD OF REVIEW .....................................................................17

ARGUMENT ..........................................................................................18

I.    THE CLAIMS DO NOT SUPPORT ADDING A NEGATIVE LIMITATION THAT PRECLUDES INVOKING THE CP LOGIC ...........18

II.   THE SPECIFICATION DOES NOT SUPPORT ADDING A NEGATIVE LIMITATION THAT PRECLUDES INVOKING THE CP LOGIC .........................................................................................22

III.  AYLUS' IPR STATEMENTS DO NOT SUPPORT ADDING A NEGATIVE LIMITATION THAT PRECLUDES INVOKING THE CP LOGIC .........................................................................................25

      A.     IPR Proceedings Are Not Part of a Patent's Prosecution History ......26

      B.     The Preliminary Response Is Not Part of an IPR Proceeding ............27

C.    The Statements in the Preliminary Response Are Not a Clear and Unmistakable Disclaimer ............................................................29

IV.    ABSENT A NEGATIVE LIMITATION THAT PRECLUDES INVOKING THE CP LOGIC, THE GRANT OF SUMMARY JUDGMENT MUST BE REVERSED..........................................................35

CONCLUSION ......................................................................................36

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages 10-11 of the brief and pages Appx3-5 and Appx12 of the Addendum contains confidential details about Apple's proprietary AirPlay process

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adv. Steel Recovery, LLC v. X-Body Equip., Inc.*,
808 F.3d 1313 (Fed. Cir. 2015) ........................................................... 17

*Bayer AG v. Elan Pharm. Res. Corp.*,
212 F.3d 1241 (Fed. Cir. 2000) ........................................................... 30

*Beckson Marine, Inc. v. NFM, Inc.*,
292 F.3d 718 (Fed. Cir. 2002) ............................................................. 27

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004) ........................................................... 21

*Cioffi v. Google, Inc.*,
632 Fed. App'x 1013 (Fed. Cir. 2015) ............................................ 30, 31

*In re Cuozzo Speed Technologies, LLC*,
793 F.3d 1268 (Fed. Cir. 2015),
*cert. granted* Jan. 15, 2016 ........................................................... 26, 28

*Curpite Mine Partners, LLC v. Anderson*,
809 F.3d 548 (9th Cir. 2015) ............................................................... 17

*Ecolab, Inc. v. FMC Corp.*,
569 F.3d 1335 (Fed. Cir. 2009) ...................................... 29, 30, 33, 34

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ...................................................... 20, 21

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997) ............................................................. 21

*Greenliant Sys., Inc. v. Xicor LLC*,
692 F.3d 1261 (Fed. Cir. 2012) ........................................................... 35

*Intellectual Ventures II LLC v. JPMorgan Chase & Co.*,
781 F.3d 1372 (Fed. Cir. 2015) ...................................................... 28, 29

*Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*,
  814 F.3d 1343 (Fed. Cir. 2016) ...................................................................... 17, 19

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................................... 30

*SanDisk Corp. v. Memorex Products, Inc.*,
  415 F.3d 1278 (Fed. Cir. 2005) ...................................................24, 30, 31, 34, 35

*Seachange Int'l, Inc. v. C-COR Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005) .......................................................................... 19

*Shaw Indus. Grp., Inc. v. Automated Creel Sys., Inc.*,
  -- F.3d --, 2016 WL 1128083 (Fed. Cir. Mar. 23, 2016) ..................................... 28

*Tas Energy, Inc. v. San Diego Gas & Elec. Co.*,
  No. 12-cv-2777-GPC(BGS), 2014 U.S. Dist. LEXIS 26107
  (S.D. Cal. Feb. 26, 2014) ................................................................................... 26

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001) .......................................................................... 20

*TomTom, Inc. v. Adolph*,
  790 F.3d 1315 (Fed. Cir. 2015) .......................................................................... 23

*Vizio, Inc. v. International Trade Commission*,
  605 F.3d 1330 (Fed. Cir. 2010) ......................................................................23, 24

## **Administrative Materials**

*Apotex v. Wyeth,*
  IPR2015-00873, Paper No. 8 (PTAB Sep. 16, 2015).......................................... 29

*Google Inc. v. Jongerius Panoramic Techs., LLC,*
  IPR2013–00191, Paper No. 50 (Feb. 13, 2014) .................................................. 27

## <u>Statutes</u>

35 U.S.C. § 313.................................................................................................27

35 U.S.C. § 314(a) .......................................................................................27, 28

35 U.S.C. § 314(d)............................................................................................28

35 U.S.C. § 315(e) ............................................................................................29

35 U.S.C. § 315(e)(1)........................................................................................29

35 U.S.C. § 318(a)............................................................................................28

37 C.F.R. § 42.107(a)........................................................................................28

37 C.F.R. § 42.2 ...............................................................................................27

28 U.S.C. § 1295(a)(1)........................................................................................5

28 U.S.C. § 1338(a) ............................................................................................5

## STATEMENT OF RELATED CASES

No appeal from this civil action has previously been before this Court or any other appellate court.  There is no case pending in this Court or any other court that will directly affect, or be directly affected by, this Court's decision in this appeal, or that is related to this dispute.

## INTRODUCTION

This appeal presents a single, pure issue of claim construction.  The district court improperly added a negative limitation to the asserted patent claims and, because of that negative limitation, granted summary judgment of non-infringement to Defendant Apple Inc.  Because the district court's re-writing of the claims was improper and unsupported by the patent claims and specification, this Court should reverse.

The asserted patent (U.S. Patent No. RE44,412 or "the '412 Patent") relates to a media streaming architecture that allows a user to coordinate the delivery of media content from an Internet-based media server to a media renderer.  Apple's accused "AirPlay" feature illustrates the basic premise:  A user of an Apple iOS device (such as an iPad or iPhone) can select movies and other media content from iTunes (an Internet storefront) with the iOS device and coordinate its delivery to a television connected to an Apple TV device, using the iOS device to control the presentation like a remote control.  At issue in this case are the multi-step

1

interactions between the iOS device (a Control Point Proxy or "CPP"), iTunes (a Control Point or "CP"), the cloud-based server that hosts iTunes' media content (a Media Server or "MS"), and the Apple TV (a Media Renderer or "MR"). Depending on certain variables, media delivery is accomplished by invoking the CP logic (*i.e.*, the CP's firmware or software), the CPP logic, or both.

Both asserted claims (claims 2 and 21) recite that "the CPP logic is invoked to negotiate media content delivery between the MS [Media Server] and the MR [Media Renderer] . . ." But these claims are silent on whether the *CP logic* may *also* be invoked. They merely require the CPP logic to be invoked, while being agnostic as to whether the CP logic is also invoked. Under normal principles of claim construction, requiring the CPP logic to be invoked does not preclude the CP logic, or any other element, from being invoked as well.

The district court, however, grafted a negative limitation onto these asserted claims to provide that the CP logic *cannot* be invoked. The district court then used this negative limitation to grant summary judgment of non-infringement to Apple, on the theory that the alleged CPP logic and CP logic are both invoked in Apple's accused system.

The district court's claim construction, and thus its grant of summary judgment of non-infringement, is erroneous as a matter of law. The district court

asserted three bases to support its rewriting of the asserted claims, none of which actually supports the district court's conclusion:

*First*, the district court noted that other, non-asserted claims (claims 1 and 20) require invoking *both* the CPP logic and the CP logic. According to the district court, because the CPP logic and CP logic are both invoked in claims 1 and 20, the CP logic cannot be invoked in addition to the required CPP logic in the asserted claims (claims 2 and 21) under the doctrine of claim differentiation. Otherwise, the district court concluded, there would be no meaningful difference between these unasserted claims and the asserted claims. But claims 1 and 20 are differentiated from claims 2 and 21 not only by the required invocations of logic but also by their different *networking architectures*. Specifically, claims 1 and 20 require that at least one of the Media Server and Media Renderer is *not* in communication with the User Endpoint (which contains the CPP) "via a local wireless network" (*e.g.*, WiFi or Bluetooth), whereas claims 2 and 21 require that *both* the Media Server and Media Renderer *are* in communication with the User Endpoint via a local wireless network. Thus, in claims 1 and 20, because the CPP is not in local wireless communication with one of the Media Server and Media Renderer via the local wireless network, the CPP logic and CP logic must both be invoked for the invention to function. But in claims 2 and 21, where the networking architecture provides that the CPP *is* in communication with *both* the Media Server and Media

3

Renderer via a local wireless network, only the CPP logic is required to be invoked for the invention to function.  Although the CP logic is not required to be invoked for claims 2 and 21, nothing in those claims *precludes* the CP logic from also being invoked.  There was no need for the district court to graft a negative limitation that the CP cannot be invoked onto claims 2 and 21 merely to differentiate them from claims 1 and 20.

*Second*, the district court cited a single specification passage stating that there is no "need" to involve the CP when the CPP is in communication with both the Media Server and Media Renderer, as is the case in claims 2 and 21.  But this specification passage merely said that there is no "need" to involve the CP in this scenario—not that it is *prohibited* to involve the CP in this scenario.  Thus, this specification passage is entirely consistent with the plain language of claims 2 and 21, which requires the CPP logic to be invoked while being agnostic as to whether the CP logic is invoked as well.

*Third*, the district court relied on Aylus' Preliminary Response to Apple's *inter partes* review ("IPR") petitions regarding the '412 Patent.  Specifically, the district court relied on certain statements by Aylus that "only" the CPP logic is invoked in claims 2 and 21.  The district court held that these statements effectively constituted a prosecution disclaimer of any role for the CP in claims 2 and 21.  But this conclusion was erroneous for several reasons.  First, statements made in an IPR

4

— an adjudicative proceeding — are not "prosecution" statements that can constitute a prosecution disclaimer at all. Second, statements made during a Preliminary Response to an IPR petition—*before* an IPR has been instituted—are even less apt to be deemed prosecution disclaimers. And third, Aylus' statements did not "clearly" or "unmistakably" disclaim any role for the CP in claims 2 and 21, as would be required to find a disclaimer. Rather, Aylus' statements that "only" the CPP logic was invoked in those claims can easily be read to mean that "only" the CPP logic was *required* to be invoked, which is abundantly clear when the statements are read in their full context.

## JURISDICTIONAL STATEMENT

This is an appeal from a final decision granting summary judgment of non-infringement, entered on January 21, 2016. Appx18. Jurisdiction was based on 28 U.S.C. §1338(a). Aylus' notice of appeal was timely filed on February 18, 2016. Appx1177. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1. The asserted claims (claims 2 and 21) require that "the CPP logic is invoked to negotiate media content delivery between the MS and the MR," and nothing in the intrinsic evidence suggests that this limitation precludes the CP logic from also being invoked. Did the district court err by adding a negative limitation

requiring that the CP logic is not invoked and using this negative limitation to grant summary judgment of non-infringement?

## STATEMENT OF THE CASE

### A.    The Asserted Patent

The patent-in-suit, U.S. Patent No. RE44,412 ("the '412 patent"), is titled "Digital Home Networks Having a Control Point Located on a Wide Area Network."   Appx56.   The patent generally teaches a method and network architecture for streaming and displaying media content in a user's location, using a control point or CP in the wide area network (*e.g.*, in the Internet) and a control point proxy or CPP in the user's device.  As stated in the Summary of the Invention:

> The invention provides systems and methods for implementing digital home networks having a control point located on a wide area network.  The control point may be implemented on a serving node connected to the wide area network, and have the capability of working in conjunction with one or more control point proxies that are located in handsets connected to a 3G wireless network, or in remote control units located within the home.  The control point and control point proxies cooperatively negotiate media delivery from a user-selected media server, such as a home stereo or DVD player, to a user-selected media renderer, such as a TV display or the display on a handset.

Appx78 at 5:35-46.

The two asserted claims are dependent claims 2 and 21.  Claim 2 depends from claim 1; claim 21 depends from claim 20.  Claim 1 recites:

A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, comprising the acts of:

> provisioning a serving node in the wide area network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR, wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the CP logic resides in the signaling domain and serves as a first proxy;

> provisioning the UE of the wide area network with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with CP logic to negotiate media content delivery between the MS and the MR, and (iii) video cassette recorder (VCR) controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a second proxy;

> in response to a media content delivery request, determining a network context of the UE and a network connectivity of the MS and MR;

> *invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR if one of the MS and MR are not in communication with the UE via a local wireless network*; and

> once media content delivery is negotiated, controlling a presentation of delivery via the VCR controls on the UE.

Appx87 at 24:37-63 (emphasis added).

Claim 2 recites (emphasis added):

> The method of claim 1, *wherein the CPP logic is invoked to negotiate media content delivery between the MS and the MR if the MS and MR are both in communication with the UE via a local wireless network.*

*Id.* at 24:64-67 (emphasis added).

Thus, claims 1 and 2 recite methods for delivering media content from a Media Server to a Media Renderer, using CP logic and/or CPP logic to negotiate the media content delivery from the Media Server to the Media Renderer. The logic that must be invoked depends on the result of the prior limitation's requirement of "determining a network context of the User Endpoint and a network connectivity of the Media Server and Media Renderer." *Id.* at 24:55-57.[1] This is a two-step process: (1) determining network context (*e.g.*, is WiFi, Bluetooth, and/or cellular service available to the User Endpoint; and (2) determining network connectivity (*i.e.*, given the network context, do the Media Server and Media Renderer allow connection with the User Endpoint).

For example, a Media Server may require that the User Endpoint have WiFi access in order for the User Endpoint to connect with it. Indeed, Apple's AirPlay works in this fashion. Other Media Servers may allow a connection if the User

---

[1]    Claim 1 literally recites that "one of the MS and MR are not in communication with the UE," but the UE (user endpoint) contains the CPP. *See* Appx87 at 24:60-61; *id.* at 24:46-47 ("provisioning the UE of the wide area network with control point proxy (CPP) logic . . .").

Endpoint does not have Wi-Fi but has cellular service (*e.g.*, a server hosting free content). Or a restricted-access server (*e.g.*, the Department of Justice's servers) may not allow a connection even if the User Endpoint has WiFi and any number of other networks available to it.

Claim 1 recites a scenario where at least one of the Media Server and Media Renderer is not in communication with the CPP via a local wireless network. It requires "invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR" because both the CPP logic and CP logic are required to be invoked for the invention to function in this scenario. By contrast, claim 2 recites a scenario where both the Media Server and Media Renderer are in communication with the CPP via a local wireless network. It requires that "the CPP logic is invoked to negotiate media content delivery between the MS and the MR" because only the CPP logic is *required* to be invoked for the invention to function in this scenario.

Although claim 2 affirmatively requires the CPP logic to be invoked, it contains no negative limitation saying that the *CP* may *not* be invoked. Moreover, because claim 2 depends from claim 1, it includes the claim 1 limitation of "provisioning a serving node in the wide area network with control point (CP) logic." Appx87 at 24:40-42. Thus, claim 2 affirmatively requires the *presence* of

*Confidential Material Redacted*

the CP logic, and is simply silent on whether the CP logic is invoked to help the CPP logic negotiate the media content delivery.

For purposes of this appeal, asserted claim 21 is substantially identical to asserted claim 2 and contains the same limitation that "the CPP logic is invoked to negotiate media content delivery between the MS and the MR if the MS and MR are both in communication with the UE via a local wireless network." Likewise, claim 20 (from which asserted claim 21 depends) is substantially identical to claim 1 (from which asserted claim 2 depends).

In this lawsuit, Aylus had originally asserted additional claims against Apple, including claims 1 and 20. As discussed below, the list of asserted claims was later reduced to just claims 2 and 21.

## B.    The Accused Process

The process accused of infringing claims 2 and 21 is Apple's "AirPlay" process, which allows users to stream iTunes Store video content to their TVs, using their iOS devices (*e.g.*, iPhones or iPads) for control. At a high level, the AirPlay process requires the following steps: ███████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████    *See generally* Appx102-104.

Under Aylus' infringement theory, the iOS device software is the claimed CPP logic, the iTunes Store software is the claimed CP logic, the CDN server is the claimed Media Server, and the Apple TV is the claimed Media Renderer. Appx157-58.  It is undisputed that both the CPP logic (iOS device software) and CP logic (iTunes Store software) are involved to help deliver media content from the Media Server (CDN server) to Media Renderer (Apple TV).  Appx102-104.

C.    **The *Inter Partes* Review Proceedings and the Narrowing of the Case to Claims 2 and 21**

Aylus filed this action on October 9, 2013.  On September 29, 2014, Apple filed two *inter partes* review (IPR) petitions for all asserted claims of the '412 patent.

On April 22, 2015, the Patent Trial and Appeal Board ("PTAB" or "Board") issued an Institution Decision instituting an IPR for claims 1, 3, 5-20, 22, and 24-33, but declining to institute an IPR for claims 2, 4, 21, or 23.  Appx825-26.  Aylus subsequently dismissed certain asserted claims and elected to proceed only on claims 2 and 21 (Appx 846-47), because it was undisputed that the alleged MS and MR are "both in communication with the UE via a local wireless network," as

11

provided in claims 2 and 21.  Appx920-21, at ¶ 210; Appx166; Appx87 at 24:66-67; Appx88 at 26:17-18.[2]

As relevant here, Aylus made certain statements to the Board in its Preliminary Responses to Apple's IPR petitions.  Specifically, when summarizing the various claims, Aylus stated that:

> Claims 1, 2, and 4 (as well as Claims 20, 21, and 23) combine to claim three alternate steps for establishing connections and delivering media content depending on the determined network context of the UE and network connectivity of the MS and MR.  Specifically, for claims 1 and 20, if, based on the previous step, it is determined that "one of the MS and MR are not in communication with the UE via a local wireless network" the "CPP logic and the CP logic are both invoked and will "cooperatively negotiate media content delivery between the MS and the MR."  *If, however, "the MS and MR are both in communication with the UE via a local wireless network," then only "the CPP is invoked to negotiate media content delivery between the MS and the MR."*  [Claims 2 and 21].

Appx1003-04 (brackets in original, emphasis added); *see also* Appx1068 (same).

Thus, after the word "only" in the final sentence, Aylus quoted the relevant "invoking" limitation of claims 2 and 21, to show that this was the "only" limitation that those claims imposed in terms of what must be invoked.

---

[2]     By contrast, the other previously-asserted claims recited conditions in which one of the Media Server and Media Renderer were *not* in communication with the UE via a local wireless network.

Aylus made a substantially identical statement at another point in its Preliminary Responses, stating as follows:

> [T]he challenged claims require determining the "network context" of the UE (*i.e.*, the networks available to the UE) and the "network connectivity" of the MS and MR (*i.e.*, the networks through which the UE can communicate with the MS and MR). Based on these determinations, the challenged independent claims require that the control point logic and control point proxy logic both be invoked to "cooperatively negotiate media content delivery between the MS and the MR" if it is determined that "one of the MS and MR are not in communication with the UE via a local wireless network." Similarly, certain of the challenged dependent claims require that only the control point logic (or only the control point proxy logic) be invoked if it is determined that neither (or both) the MS or the MR are in communication with the UE via the local wireless network.

Appx973; *see also* Appx1039 (same).

Notably, immediately after each of these statements, Aylus explained to the Board that these "invoking" steps *reduce* (rather than eliminate) communication with the CP in the wide-area network, in order to *reduce* expensive bandwidth. Appx1004 ("[T]hese [invoking] steps serve the key purpose of enabling the claimed invention to use a local wireless network whenever such a network is available in order to *reduce* the 'wireless spectrum-consuming communications between the CP, media servers and media renderers.'") (quoting '412 patent [Appx83] at 16:26-36, 17:7-19) (emphasis added); Appx973 ("[T]his [invoking decision] is a key aspect of the claimed invention, which addresses an important objective, namely: *reducing*

13

the use of expensive bandwidth (*e.g.*, wide area cellular networks) . . .") (emphasis added).

### D.    The District Court's Summary Judgment Order

On October 19, 2015, Apple moved for summary judgment of non-infringement.  Appx1097.  In its motion, Apple argued (among other things) that asserted claims 2 and 21 require invoking *only* the CPP logic to negotiate media content delivery and, thus, because the accused AirPlay process invokes both the alleged CPP logic (the iOS device software) and the alleged CP logic (the iTunes Store software), it cannot infringe.  Appx1106-11.

On January 21, 2016, the district court granted summary judgment of non-infringement on this ground.  The district court agreed with Apple that the "CPP logic is invoked" limitation of claims 2 and 21 requires that *only* the CPP logic be invoked, and that the CP logic thus cannot be invoked:

> During the claim construction process, the Court was not asked to construe the term "The CPP is invoked." However, the Court agrees with Apple that based on the language of the patent and Aylus's statements during the *inter partes* review process, dependent claims 2 and 21 require that only the CPP logic is invoked to negotiate media content delivery.

*See* Appx6 at 6:20-23.  The district court then used this claim construction to grant summary judgment of non-infringement because it was undisputed that Apple's accused AirPlay process requires invoking both the alleged CPP logic (the iOS

device software) and the alleged CP logic (the software on the iTunes Store server).

Appx12 at 12:12-16 ("In sum, whereas dependent claims 2 and 21 require that only

the CPP logic be invoked to negotiate media content delivery, Aylus's expert

admits that both versions of AirPlay require steps that invoke the CP (and the CPP)

to negotiate media content delivery. Thus, Apple does not perform dependent

claims 2 and 21.").

The district court cited the claims, specification, and IPR proceedings in

support its construction that "the CPP logic is invoked" precludes invoking the CP

logic. Regarding the claims themselves, the district court noted that claims 1 and

20 recite that the CPP logic and CP logic are both invoked to negotiate media

content delivery, while claims 2 and 21 recite that the CPP logic is invoked. The

district court concluded that

> [b]ased on this [claim] language, the independent and
> dependent claims are distinguishable by whether both the
> CPP logic and the CP logic negotiate media content
> delivery (independent claims 1 and 20) or if only the CPP
> logic negotiates media content delivery (dependent claims
> 2 and 21) . . . To read dependent claims 2 and 21 as
> encompassing both the invocation of CPP logic and CP
> logic would render this distinction meaningless.

Appx7 at 7:1-4.

Regarding the specification, the district court cited a passage stating that

"where the UE is in the proximity of both the desired MS and the desired MR and

can communicate with them via a [Personal Area Network], such as Wi-Fi, the CPP

15

in the UE negotiates the association between the MS and MR.  In this case, *there is no need to involve the CP* in the SN, since this would involve unnecessary use of wireless bandwidth."  *Id.* at 7:15-19 (quoting '412 patent [Appx84] at 17:50-55 (district court's brackets and emphasis)).

Finally, regarding the IPR proceedings, the district court quoted certain statements that Aylus made in its Preliminary Responses to Apple's IPR petitions. Specifically, the district court quoted Aylus' purported statements that "only" the CPP was invoked in claims 2 and 21.  Appx8 at 8:6-9:13.  The district court held that these statements "are akin to a prosecution disclaimer" of any role for the CP in claims 2 and 21.  *Id.* at 8:8.  In support of this conclusion, the district court cited a handful of district court decisions holding that "prosecution disclaimer has viability in *in[ter] partes* review proceedings," *id.* n.1, but no decisions of this Court.

## SUMMARY OF ARGUMENT

The district court's grant of summary judgment of non-infringement should be reversed.  The summary judgment was based entirely on the district court's decision to read in a negative claim limitation stating that the CP logic cannot be invoked in claims 2 and 21.  But there was no basis for the district court to read in this limitation.  The claims themselves do not support this limitation; they merely require the CPP logic to be invoked and are indifferent as to whether the CP logic is invoked as well.  The specification does not support this limitation; nowhere does it

say or even suggest that the CP logic may not be invoked in claims 2 and 21. And Aylus' IPR statements do not support this limitation either, for three reasons. First, IPR statements cannot disclaim claim scope as a matter of law. Second, *preliminary* IPR statements are even more inapt to be considered disclaimers. Third, Aylus' IPR statements that "only 'the CPP is invoked'"—when read in their full context as they must be—can easily be understood to mean that "only" the CPP logic was *required* to be invoked in claims 2 and 21, not that the CP logic was *precluded* from being invoked in those claims. Consequently, these IPR statements did not constitute a clear and unmistakable disclaimer of claim scope.

## <u>STANDARD OF REVIEW</u>

This Court reviews a grant of summary judgment under the law of the regional circuit. *Adv. Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1316 (Fed. Cir. 2015). Under applicable Ninth Circuit law, a grant of summary judgment is reviewed *de novo*. *Curpite Mine Partners, LLC v. Anderson*, 809 F.3d 548, 551 (9th Cir. 2015).

This Court also reviews a district court's claim construction *de novo* where, as here, the district court made no subsidiary factual findings based on extrinsic evidence. *Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, 814 F.3d 1343, 1352 (Fed. Cir. 2016) ("We review claim construction de novo except for subsidiary facts based on extrinsic evidence . . . .").

17

# **ARGUMENT**

This appeal presents a single issue of claim construction: namely, whether the district court erred in holding that the CP logic cannot be invoked in asserted claims 2 and 21.  If the district court erred by reading this negative limitation into the claims, then the summary judgment must be reversed because the sole factual basis for summary judgment was that the alleged CPP logic (iOS device software) and alleged CP logic (iTunes Store software) are *both* invoked in the accused AirPlay process.

As demonstrated below, the district court did in fact err by adding the negative limitation that the CP logic cannot be invoked in claims 2 and 21.  Neither the claims, nor the specification, nor the IPR history support adding this negative limitation to the claims.

## I.    **THE CLAIMS DO NOT SUPPORT ADDING A NEGATIVE LIMITATION THAT PRECLUDES INVOKING THE CP LOGIC**

The district court relied first and foremost on the claims themselves to support adding a negative limitation that the CP logic cannot be invoked in claims 2 and 21.  The district court reasoned that "the independent and dependent claims are distinguishable by whether both the CPP logic and the CP logic negotiate media content delivery (independent claims 1 and 20) or if only the CPP logic negotiates media content delivery (dependent claims 2 and 21) . . . . To read dependent claims 2 and 21 as encompassing both the invocation of CPP logic and CP logic would

18

render this distinction meaningless." Appx7 at 7:1-4. To arrive at this conclusion, the district court invoked claim differentiation, quoting this Court's statement that "[t]he doctrine of claim differentiation stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Id.* (quoting *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005)).

But the district court's claim differentiation analysis is erroneous because claims 1 and 20 are different in meaning and scope from claims 2 and 21 even without the negative limitation that the district court grafted onto the claim language. Specifically, claims 1 and 20 are differentiated from claims 2 and 21 by their different networking architectures. Claims 1 and 20 recite that "one of the MS and MR are not in communication with the UE [User Endpoint] via a local wireless network," where the CPP logic and CP logic are both required to be invoked for the invention to function; claims 2 and 21 recite that "the MS and MR are both in communication with the UE via a local wireless network," where only the CPP logic is required to be invoked for the invention to function. It was improper for the district court to infer a negative limitation that the CP logic *cannot* be invoked in claims 2 and 21, merely to differentiate those claims from claims 1 and 20. *See, e.g.*, *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325 (Fed. Cir. 2001) (rejecting claim differentiation argument where, applying claim construction,

limitation in independent claim did not negate limitation in dependent claim and claims had further differences).

And under normal principles of claim construction, the fact that claim 2 only requires the CPP logic to be invoked does not preclude other components (such as the CP logic) from being invoked as well. Indeed, the normal presumption is that requiring a certain claim element to be used or invoked does not preclude other elements from being used or invoked as well. For example, in *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009), the asserted claim recited the step of "sensing radiation from multiple areas of the biological tissue with the radiation detector." *Id.* at 1318. But this Court reasoned that "nothing in [the claim] requires the detector to detect radiation *solely* from the biological tissue." *Id.* at 1319 (emphasis added). Thus, "[t]he fact that [the] O'Hara [prior art reference] detects radiation from the heated probe, in addition to detecting the peak radiation from multiple areas of the biological tissue to obtain a peak temperature signal, does not prevent O'Hara from anticipating claim 1." *Id.* The same is true here: claims 2 and 21 require the CPP logic to be invoked, but they do not require that *solely* the CPP logic be invoked. Thus, a method that invokes both the CPP logic and the CP logic would not avoid infringement of claims 2 and 21. *Accord Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("In the DNA construct of the count at issue here, 'in proper reading frame' means that the

20

nucleotides must be read in such a way that the seventy amino acids of human IGF–I are incorporated in the proper sequence in the expressed protein.  Nothing exists in the definition of 'in proper reading frame' to exclude nucleotides coding for *additional* amino acids at the beginning of the seventy amino acid IGF–I sequence.") (emphasis in original).

As Aylus explained below, "claim[s] 2 and 21 require that 'the CPP logic is invoked to negotiate media content delivery,' implying that the CPP logic has responsibility for handling the negotiation and is not *required* to share the handling of the negotiation with the CP.  But the CPP logic can still communicate with and make use of the CP logic . . ."  Appx1131 at 4:21-24 (emphasis added).  Just as the step of measuring radiation "from multiple areas of the biological tissue" in *Exergen* did not preclude measuring radiation from other sources also, the step of invoking "the CPP logic" in claims 2 and 21 does not preclude invoking other components as well.

By adding a negative limitation that the CP logic cannot be invoked in claims 2 and 21, the district court substantially rewrote these claims, contrary to settled law that "courts may not re-draft claims . . . ."  *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).  The claims instead mean just what they say: claims 1 and 20 require that the CPP logic and CP logic are both invoked, while claims 2 and 21 only require that the CPP logic is invoked.  By their plain language,

the claims recite affirmative limitations about which elements must be invoked but do not preclude invocation of other elements.  Thus, the plain language of the claims refutes the district court's position that the CP logic *cannot* be invoked in claims 2 and 21.

## II.    THE SPECIFICATION DOES NOT SUPPORT ADDING A NEGATIVE LIMITATION THAT PRECLUDES INVOKING THE CP LOGIC

The district court also relied on a single passage in the specification to support its position that claims 2 and 21 preclude any invocation of the CP logic. Specifically, the district court quoted a specification passage stating that "where the UE is in the proximity of both the desired MS and the desired MR and can communicate with them via a [Personal Area Network], such as Wi-Fi, the CPP in the UE negotiates the association between the MS and MR.  In this case, *there is no need to involve the CP* in the SN, since this would involve unnecessary use of wireless bandwidth."  Appx7 at 7:15-19 (quoting '412 patent [Appx84] at 17:50-55 (district court's brackets and emphasis)).

But like the claim language, this specification passage does not support adding a negative limitation that *precludes* use of the CP logic.  By its plain terms, this specification passage states that "there is no *need* to involve the CP" when the Media Server and the Media Renderer are both in communication with the User Endpoint and CPP via a local wireless network, as is the case in claims 2 and 21.

22

Saying that there is no *need* to involve the CP logic in this situation means that the CP logic might not be invoked, but it is not tantamount to saying that the CP *cannot* be invoked in this situation.

*Vizio, Inc. v. International Trade Commission*, 605 F.3d 1330 (Fed. Cir. 2010) illustrates this point. In *Vizio*, the patentees made statements in prosecution that a Program Map Table (PMT or MPEG PMT) was not "needed" in their invention, unlike in the prior art. *Id.* at 1339. But this Court held that, by doing so, the patentees did not *preclude* use of the Program Map Table:

> In stating that the PMT is not needed to demultiplex program components, the inventors were distinguishing the Wasilewski system by making clear that the claimed invention was not dependent on the MPEG PMT, but there is no basis for concluding that the patentees intended a sweeping disclaimer of any and all use of the MPEG PMT . . . These statements made in order to obtain claim allowance are sufficiently clear to constitute a disclaimer of devices (or methods) in which use of the MPEG PMT is *required* to decode. However, we agree with the Commission that nothing in the above-quoted passage from the prosecution history suggests an intent to disclaim any and all use of the PMT.

*Id.* (emphasis in original); *see also TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1325 (Fed. Cir. 2015) (statements in prosecution that initial map database was not *required* by claimed invention did not disclaim or prohibit presence of initial map table).

The same reasoning applies here.  The '412 patent specification states that the CP logic is not *needed* when the MS and MR are in communication with the UE and CPP via a local wireless network, as is the case in claims 2 and 21.  But as in *Vizio*, stating that a given element is not *needed* does not equate to a statement that such element *cannot* be used.  Accordingly, the district court erred in reading the '412 patent specification to say that the CP logic is *precluded* whenever the Media Server and the Media Renderer are in communication with the User Endpoint and CPP via a local wireless network, as is the case in claims 2 and 21.

The district court's reliance on this specification passage is also misplaced for another reason: There is no suggestion that the cited passage of the specification is meant to describe claims 2 and 21 as a whole, as opposed to merely a particular embodiment of those claims.  And "it is axiomatic that without more the court will not limit claim terms to a preferred embodiment described in the specification." *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005). So even if this specification passage could be read to preclude any invocation of the CP logic — which, as demonstrated above, it cannot — claims 2 and 21 are not limited to the embodiment described by this passage.  Rather, claims 2 and 21 leave open the possibility of invoking the CP logic (or not).

Indeed, other portions of the specification bear this out.  For example, the specification states that "[i]n a preferred embodiment, wireless spectrum-consuming

communications between the CP, media servers and media renderers are *reduced* by introducing a CP Proxy (CPP) that resides in the UE."  Appx83 at 16:33-36 (emphasis added).  This shows that the CPP logic can be used to "reduce" the CP's role, not necessarily *eliminate* that role.  To be sure, one form of reduction would be reducing the CP's role down to zero — *i.e.*, not invoking the CP logic at all.  But nothing in the asserted claims compels that design choice.

## III. AYLUS' IPR STATEMENTS DO NOT SUPPORT ADDING A NEGATIVE LIMITATION THAT PRECLUDES INVOKING THE CP LOGIC

The district court also relied on Aylus' IPR statements to confirm its claim differentiation analysis, treating those statements as a prosecution disclaimer of any role for the CP in claims 2 and 21.  Appx8 at 8:6-9:13.  The district court's reliance on these statements was erroneous for at least three reasons: (1) IPR proceedings are adjudicative and therefore do not form part of the patent prosecution any more than patent litigation does; (2) even if IPR proceedings can be considered part of the prosecution history, a statement made during the preliminary, pre-institution stage of an IPR is not part of an IPR "proceeding" and thus cannot amount to a disclaimer; and (3) even if statements made in the preliminary, pre-institution stage of an IPR could constitute a disclaimer, the statements relied on by the district court, when read in their full context as they must be, did not amount to a clear and unmistakable disclaimer of claim scope here.

## A.   IPR Proceedings Are Not Part of a Patent's Prosecution History

Statements made during an IPR proceeding are not part of a patent's prosecution history because they are not part of the examination of the patent. "Effective September 16, 2012, the Leahy-Smith America Invents Act ('AIA') . . . converted the [review] process from an examination to an adjudicative one." *Tas Energy, Inc. v. San Diego Gas & Elec. Co.*, No. 12-cv-2777-GPC(BGS), 2014 U.S. Dist. LEXIS 26107, at *4 (S.D. Cal. Feb. 26, 2014) (Appx1180).  The implications of the characterization of an IPR as adjudicative as opposed to examination are currently before the Supreme Court in *In re Cuozzo Speed Technologies, LLC*, 793 F.3d 1268 (Fed. Cir. 2015), *cert. granted* Jan. 15, 2016, where the Court granted certiorari to consider whether patent claims in an IPR should be construed using the "broadest reasonable interpretation" standard applied in patent examination proceedings or their actual meaning, as in patent litigation.  This claim construction issue will likely turn, at least in part, on the characterization of an IPR as adjudicative as opposed to an examination.  *See id*. at 1288-89 (Newman, J., dissenting) (noting that "[t]he House Report explained that Congress intended to 'convert' inter partes reexamination 'from an examinational proceeding to an adjudicative proceeding'" and that PTAB itself characterized *inter partes* review as "'neither a patent examination nor a patent reexamination,' but is 'a trial, adjudicatory in nature [which] constitutes litigation'") (quoting H.R. Rep. No. 112–

98, pt. 1, at 46–48 (2011) and *Google Inc. v. Jongerius Panoramic Techs., LLC,* IPR2013–00191, Paper No. 50, at 4 (Feb. 13, 2014), respectively).

The ability or inability of IPR proceedings to create a prosecution disclaimer should turn on the same distinction. Statements made during an IPR should no more create a prosecution disclaimer than statements made during litigation. Absent a finding of judicial estoppel, statements made by a patent owner during litigation cannot modify the meaning of claim terms. *See Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 726 (Fed. Cir. 2002). The same should be true for statements made during adjudicative IPR proceedings.

### B.    The Preliminary Response Is Not Part of an IPR Proceeding

Even if the Court considers statements made during an IPR proceeding to be part of the patent's prosecution history, an IPR proceeding does not begin until the IPR trial has been instituted. An IPR is divided into two stages: (i) a preliminary stage; and (ii) a trial stage. The preliminary stage begins with the filing of a petition to institute a trial and ends with the decision whether to institute a trial. 37 CFR § 42.2. During the preliminary stage, the patent owner has the option to file a preliminary response that the Board considers in its decision of whether to institute a trial. 35 U.S.C. §§ 313, 314(a). There is no opportunity for the patent owner to propose claim amendments in its preliminary response, 37 C.F.R § 42.107(a), and

any claim constructions offered by the Board in its institution decision are necessarily preliminary pending the patent owner's formal response.

The outcome of the preliminary stage is not a determination of whether a given patent claim is valid or invalid. It is only a determination of whether the petitioner has met the statutory threshold for institution of a trial. 35 U.S.C. § 314(a). If the Board determines that the threshold has been met, it will institute a trial. The decision to institute a trial is not subject to appellate review because it is not a final decision on the merits. 35 U.S.C. § 314(d); *In re Cuozzo*, 793 F.3d at 1273. Once the Board has made the decision to institute a trial, it will *then* determine the validity of the claims following a formal response by the patentee, an opportunity for the patentee to move to amend claims, discovery, and a hearing. 35 U.S.C. § 318(a).

This Court has explained that a "proceeding" under the AIA does not begin until the Director decides whether to institute a trial. The petition and, by extension, the preliminary response is not part of the "proceeding" before the Board and, therefore, is not part of the patent's prosecution history. *See Intellectual Ventures II LLC v. JPMorgan Chase & Co*., 781 F.3d 1372, 1376 (Fed. Cir. 2015); *see also Shaw Indus. Grp., Inc. v. Automated Creel Sys., Inc.*, -- F.3d --, 2016 WL 1128083, at *5 (Fed. Cir. March 23, 2016) ("The IPR does not begin until it is instituted.") This is consistent with the estoppel provisions of 35 U.S.C. § 315(e),

which create an estoppel only as to grounds that petitioner "raised or reasonably could have raised *during* [the] inter partes review." (emphasis added). An IPR does not begin until the Office decides to institute review. *Shaw*, 2016 WL 11280883 at *5; *see also Apotex v. Wyeth*, IPR2015-00873, Paper No. 8, at 8-9 (PTAB Sep. 16, 2015) (Appx1192-93) ("[G]rounds raised during the preliminary proceeding, but not made part of the instituted trial, are not raised 'during' an inter partes review and cannot be the basis for estoppel under 35 U.S.C. § 315(e)(1).") (*citing Intellectual Ventures*).

Thus, even if statements made "during" an IPR could form part of the prosecution history and thus constitute a prosecution disclaimer, Aylus' *pre-institution* statements were not made "during" an IPR. Thus, they are not prosecution statements (*i.e.*, were not made during prosecution) and cannot amount to a prosecution disclaimer.

### C.    The Statements in the Preliminary Response Are Not a Clear and Unmistakable Disclaimer

Finally, even if a preliminary response to an IPR request is part of a patent's prosecution history, Aylus' IPR statements relied on by the district court did not disclaim any role for the CP logic in claims 2 and 21. This Court has repeatedly held that to constitute a disclaimer that alters claim scope, statements in prosecution must constitute "a clear and unmistakable surrender of subject matter." *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) (quoting *Bayer AG v. Elan*

*Pharm. Res. Corp.*, 212 F.3d 1241, 1251 (Fed. Cir. 2000)). There is a "'heavy presumption' that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (internal citation omitted). In *Ecolab*, this Court noted that "[e]ven if an isolated statement appears to disclaim subject matter, the prosecution history as a whole may demonstrate that the patentee committed no clear and unmistakable disclaimer." 569 F.3d at 1342. Moreover, "'[t]here is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term.'" *Cioffi v. Google, Inc.*, 632 Fed. App'x 1013, 1021 (Fed. Cir. 2015) (quoting *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005).)

Under these standards, Aylus' statements — when read in their full context — fall far short of a clear and unmistakable disclaimer of claim scope that prevents the CP logic from playing any role in claims 2 and 21. As explained above, the district court relied on Aylus' purported statements that "only" the CPP logic is invoked in claims 2 and 21. *See* Statement of the Case, §§ C-D, *supra*. The alleged disclaimer was limited to that single word — "only." But when read in context, Aylus' statements can reasonably be interpreted to mean that "only" the CPP logic

is *required* to be invoked in those claims — not that the *CP logic* is *preluded* from being invoked. *Cioffi*, 632 Fed. App'x at 1021; *Sandisk*, 415 F.3d at 1287.

Putting Aylus' "only the CPP [logic]" statement in context, Aylus actually stated:

> [F]or claims 1 and 20, if, based on the previous step, it is determined that "one of the MS and MR are not in communication with the UE via a local wireless network" the "CPP logic and the CP logic are both invoked" and will "cooperatively negotiate media content delivery between the MS and the MR." If, however, "the MS and MR are both in communication with the UE via a local wireless network," then only "the CPP is invoked to negotiate media content delivery between the MS and the MR." [Claims 2 and 21].

Appx1003-04; (brackets in original) *see also* Appx1068 (same). The word "only" in this statement was followed by a verbatim quote of the "invoking" step of claims 2 and 21, without further elaboration. Thus, this statement can reasonably be interpreted to mean that the CPP logic is the "only" logic required to be invoked by these claims, unlike in claims 1 and 20, where both the CPP logic and CP logic are expressly required to be invoked.

This inference is particularly compelling in view of Aylus' statements that follow the quote reproduced above. Specifically, in the paragraph immediately below this quote, Aylus explained that "these [invoking] steps serve the key purpose of enabling the claimed invention to use a local wireless network whenever such a network is available in order to *reduce* the 'wireless spectrum-consuming

31

communications between the CP, media servers and media renderers.'"  Appx1004 (quoting '412 patent [Appx83-84] at 16:26-36, 17:7-19) (emphasis added). "Reducing" the CP's role is entirely consistent with a claim architecture in which only the CPP logic was *required* to be invoked and the CP can be involved as much or as little as desired.

The same is true for the other IPR statement that the district court relied on, in which Aylus stated that "certain of the challenged dependent claims require that only the control point logic (or only the control point proxy logic) be invoked if it is determined that neither (or both) the MS or the MR are in communication with the UE via the local wireless network."  Appx973; Appx1039.  This statement can easily be read to *require only* that the CPP logic be invoked, while allowing the CP logic to be invoked or not invoked.

Moreover, this statement was also followed by a statement about "*reducing the use of expensive bandwidth.*"  Appx973 (emphasis added); Appx1039 (same). As noted above, "reducing" the role of the CP in the wide-area network (in order to "reduce" expensive bandwidth) is entirely consistent with a claim architecture in which only the CPP logic is *required* to be invoked, while the CP logic can be involved as much or as little as desired.  Thus, far from clearly and unmistakably disclaiming any role for the CP in claims 2 and 21, Aylus' statements can easily be

read to mean that "only" the CPP logic is *required* to be invoked in claims 2 and 21, while the CP logic can be invoked (or not invoked) as desired.

This Court has rejected assertions of prosecution disclaimer on facts much closer to a clear disavowal of claim scope than are present here. For example, in *Ecolab*, the accused infringer argued that the patentee "disclaimed compositions containing multiple antimicrobial agents" by stating in prosecution that "[t]he peracetic acid is the *sole antimicrobial agent* in the sanitizing solution" and distinguishing prior art references by arguing that they "do not teach the use of peracetic acid alone as a sanitizer." *Ecolab*, 569 F.3d at 1342-43 (Court's emphasis). But this Court declined to read these patentee statements as a disclaimer of multi-agent compounds because they occurred at an early stage of prosecution, were not repeated in later stages of prosecution, and could be read as being "hyperbolic or erroneous." *Id.* at 1343. "[W]hen FMC's statements are considered in the context of the prosecution history as a whole, they simply are not clear and unmistakable enough to invoke the doctrine of prosecution history disclaimer." *Id.*

Here too, Aylus' allegedly-disclaiming statements were made at an early stage of the IPR proceedings, even before the IPR was instituted. And read in context, the statements are at least ambiguous regarding whether "only" the CPP logic was *required* to be invoked in claims 2 and 21 (consistent with the plain language of the claim) or whether "only" the CPP logic was *allowed* to be invoked

33

in those claims (the district court's reading).   As in *Ecolab*, Aylus' statements "simply are not clear and unmistakable enough" to disclaim any and all invocation of the CP logic in claims 2 and 21.

*SanDisk* is also instructive here.  In *SanDisk*, the patentee made a prosecution statement explaining that the memory cell array in its invention was divided into sectors, and "each sector" was partitioned into user and overhead data portions.  415 F.3d at 1288.  Relying on the "each sector" language, the district court held that the patentee had disclaimed coverage of devices where some memory cells were not so partitioned.  *Id.* at 1283, 1288.  This Court reversed, finding no such disclaimer.  *Id.* at 1288.  It reasoned that the patentee's reference to "each sector" could have reasonably meant each sector *covered by the claimed method*, not necessarily each sector in an entire memory cell array.  *Id.*  Thus, the patentee did not clearly and unmistakably disclaim all memory cell arrays with some sectors that were not partitioned into user and overhead data portions.  *Id.*

The word "only" in Aylus' IPR statements (which is the one critical word that the district court relied on to find disclaimer) is similar to the critical word "each" in *SanDisk*.  Neither word has a single, unambiguous meaning as used in their relevant prosecution or IPR statements.   As discussed above, Aylus' statements about invoking "only" the CPP logic can mean that the CPP is the only thing *allowed* to be invoked or that the CPP was the only thing *required* to be

invoked. Either interpretation gives meaning to the word "only," and either interpretation is reasonable. Thus, as in *SanDisk*, the district court erred by adopting its own interpretation and finding a disclaimer.[3]

## IV. ABSENT A NEGATIVE LIMITATION THAT PRECLUDES INVOKING THE CP LOGIC, THE GRANT OF SUMMARY JUDGMENT MUST BE REVERSED

The sole basis for the district court's grant of summary judgment was its claim construction that claims 2 and 21 preclude any invocation of the CP logic. Because the CP logic is invoked in Apple's accused AirPlay process, the district concluded that it cannot infringe. Appx12 at 12:12-16 ("In sum, whereas dependent claims 2 and 21 require that only the CPP logic be invoked to negotiate media content delivery, Aylus's expert admits that both versions of AirPlay require steps that invoke the CP (and the CPP) to negotiate media content delivery. Thus, Apple does not perform dependent claims 2 and 21."). Once the district court's negative limitation is removed from these claims — as it must be — there is no basis for

---

[3] Finally, the Board's understanding of claims 2 and 21 as having the CPP logic "exclusively handle" the negotiation, *see* Appx9 at 9:14-10:4 and Appx842, is irrelevant. The Board's understanding of the claims plays no part in the prosecution disclaimer analysis. *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1271 (Fed. Cir. 2012). This is especially true where, as here, the Board did not rely on statements by Aylus in reaching that understanding. The Board declined to institute IPR on claims 2 and 21 because it understood those claims to be different than their parent claims, which they are, and because Apple had relied on exactly the "same evidence" for both claims. Appx841-42. Notably, Apple itself correctly argued before the district court that "the scope of the disclaimer is measured by what Aylus said, not what the PTO said or did." Appx1166 at 4:15-16.

summary judgment of non-infringement and the judgment below should be reversed.

## **CONCLUSION**

For the foregoing reasons, Aylus respectfully requests that this Court reverse the district court's grant of summary judgment of non-infringement.

Dated: May 23, 2016

Respectfully submitted,

By:  */s/ Amar L. Thakur*
Amar L. Thakur
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
amarthakur@quinnemanuel.com

*Attorneys for Appellant*
*Aylus Networks, Inc.*

# **ADDENDUM**

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYLUS NETWORKS, INC., | Case No. 13-cv-04700-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION TO EXCLUDE CERTAIN OPINIONS OF APPLE'S EXPERTS; DENYING DEFENDANT'S MOTION TO EXCLUDE CERTAIN OPINIONS OF AYLUS'S EXPERTS** |
| APPLE INC., | |
| Defendant. | |
| | Docket No. 180, 182, 185, 188 |

## I.     INTRODUCTION

Plaintiff Aylus Networks, Inc. filed the instant suit against Defendant Apple, Inc., alleging that Apple's AirPlay feature infringes claims 2 and 21 of U.S. Patent No. RE44,412 ('412 patent). *See* Docket No. 37 (Second Amended Complaint) (SAC) at ¶ 11. The '412 patent concerns an invention "whereby a user of a computer or mobile device can direct and control video signals from servers located on the internet to be rendered for display on a display device (e.g., a television)." *Id.* at ¶ 10. Specifically, the '412 patent describes a media streaming architecture that allows a user to coordinate the transport of media content from an internet-based media server to a physically proximate media renderer. *Id.* at ¶ 12.

AirPlay is a feature that allows users of iOS devices – such as the iPod Touch, iPhone, and iPad – to select and display video, music, or photos on a television connected to an Apple TV. *See* Docket No. 182 at 4. AirPlay can work in two ways. First, it can "mirror" what is being shown on the screen of the Apple product onto the television. Second, it can "stream" video content that

is downloaded from the Apple iTunes store or other third party applications, such as Netflix and Hulu. Aylus's theory of direct infringement is limited to when an iOS user purchases iTunes Store video content and then AirPlays that video to a TV connected to an Apple TV. *Id.* at 3.

Pending before the Court are two motions for summary judgment and two motions to exclude expert reports. Docket No. 180 (Aylus Mot.); Docket No. 182 (Apple Mot.); Docket No. 185 (Apple Daubert Mot.); Docket No. 188 (Aylus Daubert Mot.). The parties' motions came on for hearing before the Court on December 17, 2015. For the reasons stated below, the Court **GRANTS** Apple's motion for summary judgment. Because Apple's motion for summary judgment resolves the merits of the case in its entirety, the Court need not address the remaining motions.

## II.   BACKGROUND

The '412 patent describes two scenarios, one which involves three primary components – the Control Point (CP), the Media Server (MS), and the Media Renderer (MR) – and one which involves four primary components – the CP, MS, MR, and the Control Point Proxy (CPP). In the first scenario, the CP queries the MS for a directory of content, and negotiates content delivery within the MS, including instructing the MS to deliver content to the MR. Docket No. 183 (Buergi Dec.), Exh. 6 (IPR Decision) at 4-5. The CP also negotiates media rendering with the MR, instructing the MR to start expecting content from the MS and to present such. *Id.* at 5. The MS then delivers media content to the MR. *Id.* In the second scenario, the CP is located in a wide area network via the "Service Provider," while the CPP is within the "User Premises." *Id.* at 5. There, "[t]he CP communicates with the MS, the CPP communicates with the MR, and the CP and CPP communicate with each other." *Id.* at 5-6.

Apple filed a Petition for *inter partes* review of all claims (*i.e.*, claims 1-33) of the '412 patent. The Patent Trial and Appeal Board (PTAB) initiated review of claims 1, 3, 5-20, 22, and 24-33, but not claims 2, 4, 21, and 23. *Id.* at 2. For the claims that the PTAB instituted *inter partes* review, the PTAB found that Apple would likely prevail with respect to those claims being obvious over the UPnP (Universal Plug and Play) Design book. *Id.* at 14.

Following initiation of review, Aylus dismissed with prejudice its infringement claims

United States District Court
For the Northern District of California

*Confidential Material Redacted*

except as to dependent claims 2 and 21. Docket No. 131. Claim 2 depends from claim 1, while claim 21 depends from claim 20. In relevant part, Claim 1 is:

> [a] method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, comprising the acts of . . . invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR if one of the MS and MR are not in communication with the UE [user endpoint] via a local wireless network . . . .

Buergi Dec., Exh. 1 ('412 Patent) col. 24 ll. 37-39, 58-61. Claim 2, in turn, is "[t]he method of claim 1, wherein the CPP logic is invoked to negotiate media content delivery between the MS and the MR if the MS and MR are both in communication with the UE (user endpoint) via a local wireless network." *Id.* at col. 24 ll. 64-67.

Similarly, Claim 20 is:

> [a] method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, where a user endpoint (UE) is provisioned with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with network control point (CP) logic to negotiate media content delivery between the MS and the MR, and (iii) video play controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a first proxy, comprising the acts of . . . invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR if one of the MS and MR are not in communication with the UE via a local wireless network; and

*Id.* at col. 25 ll. 55-65, col. 26 ll. 8-11. Claim 21, like claim 2, is "[t]he method of claim 20, wherein the CPP logic is invoked to negotiate media content delivery between the MS and the MR if the MS and MR are both in communication with the UE via a local wireless network." *Id.* at col. 26 ll. 14-17.

In the instant case, Aylus contends that the Control Point Proxy (CPP) is software within the iOS device, the Control Point (CP) is the iTunes Store ▇ servers (specifically the iTunes Store servers named ▇, ▇, and ▇), the Media Server (MS) is the ▇ Content Delivery Network (CDN) servers, and the Media Renderer (MR) is the Apple TV.

3

United States District Court
For the Northern District of California

***Confidential Material Redacted***

According to Aylus's technical expert, Dr. Dan Schonfeld, the accused product can be operated by: (1) AirPlay from the Cloud, and (2) AirPlay Version I. *See* Buergi Dec., Exh. 2 (Schonfeld Report) at 18, 27. For AirPlay from the Cloud, the AirPlay session begins when the user selects AirPlay on the iOS device to display content on the Apple TV. *Id.* at ¶ 46. The following sequence is then performed:

1.      The iOS device (CPP) sends to an ▉▉▉▉▉ server in the iTunes Store (CP) a ▉▉▉▉▉ request with an ▉▉▉▉▉▉▉▉▉▉▉▉▉, a ▉▉▉▉▉▉, and ▉▉▉▉▉▉▉.

2.      The ▉▉▉▉ server in the iTunes Store sends back to the iOS device a ▉▉▉▉ response that includes a ▉▉▉▉▉▉▉▉▉, which includes the ▉▉▉▉▉, ▉▉▉▉, and ▉▉▉▉▉▉.

3.      The iOS device sends the ▉▉▉▉▉▉▉▉▉▉▉▉ to the Apple TV (MR).

4.      The Apple TV sends to an ▉▉▉▉ server in the iTunes Store a ▉▉▉▉▉▉ that includes the ▉▉▉▉▉▉▉▉▉▉▉▉▉.

5.      The ▉▉▉▉ server in the iTunes Store ▉▉▉▉▉▉▉▉▉ and returns to the Apple TV a ▉▉ to a Content Delivery Network (CDN) server (MS) and a ▉▉ that includes ▉▉▉▉▉▉▉.

6.      The Apple TV requests the content from the CDN server. The request includes the ▉▉▉ and an ▉▉▉▉▉▉.

7.      The CDN server ▉▉▉▉▉▉▉▉ and begins sending encrypted content to the Apple TV.

8.      The Apple TV sends to the ▉▉▉▉▉ server in the iTunes Store a ▉▉▉▉ request that includes the ▉▉▉▉▉▉▉▉▉▉▉.

9.      The ▉▉▉▉▉ server in the iTunes Store performs authentication and returns to the Apple TV a ▉▉▉▉▉ that includes a ▉▉▉▉.

10.      The Apple TV uses the ▉▉▉▉ to ▉▉▉▉ and ▉▉▉▉▉▉. The Apple TV uses the ▉▉▉▉▉ to ▉▉▉ the encrypted content.

4

**Appx4**

*Confidential Material Redacted*

11. After some time, the Apple TV sends to the ██████ server in the iTunes Store a ████████ ████ that includes the ██████.

12. The ██████ in the iTunes Store ████████████ of the ██████ and returns a ██████ that includes the ██████.

13. The Apple TV uses the ██████ to ████████ and ████████████████. The Apple TV uses the ██████ to continue ████████ the encrypted content.

14. The Apple TV sends to the ██████ server in the iTunes Store a ████████ ███.

Buergi Dec., Exh. 7 at 13-14.

AirPlay Version 1 involves a user selecting the AirPlay button and selecting a content destination, upon which the following sequence is performed:

1. The iOS device sends to an ██████ server in the iTunes Store a ████████ ████ that includes ████████

2. The ██████ server in the iTunes Store sends back to the iOS device a ████ ████ that includes ██████.

3. The iOS device begins sending encrypted content to the Apple TV, and also transmits a ██████ and the ██████ to the Apple TV.

4. The Apple TV uses the ██████ to ████████ and ████████ ███. The Apple TV uses the ██████ to ████ the encrypted content.

*Id.* at 15.

## III.   DISCUSSION

A.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." As indicated by the language of the rule, "[t]he moving party has the burden of establishing the absence of a genuine dispute of material fact. The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036,

5

1  1049-50 (9th Cir. 2014). "'Where the record taken as a whole could not lead a rational trier of fact

2  to find for the nonmoving party, there is no genuine issue for trial.'" *Id.*

3         Where the moving party ultimately bears the burden of proof, the non-moving party may

4  prevail on a motion for summary judgment by pointing to the moving party's failure "to make a

5  showing sufficient to establish the existence of an element essential to that party's case." *Celotex*

6  *Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In contrast, where a moving party seeks summary

7  judgment in favor of its own claim, it "'must offer evidence sufficient to support a finding upon

8  every element of [its] claim . . . , except those elements admitted . . .' by the adversary." *Watts v.*

9  *United States*, 703 F.2d 346, 347 (9th Cir. 1983).

10  B.    Non-Infringement

11         Apple contends that there is no infringement of dependent claims 2 and 21 because Apple

12  does not perform the claim step "the CPP logic is invoked to negotiate media content delivery

13  between the MS and MR." Apple Mot. at 2. Specifically, Apple argues that the language "the

14  CPP is invoked" should be read as requiring that *only* the CPP logic is invoked to negotiate media

15  content delivery, whereas the allegedly infringing activity operates by using *both* the CPP logic

16  (the iOS device software) and the CP logic (the iTunes Store servers) to negotiate media content

17  delivery. Apple identifies four steps in the AirPlay from the Cloud session which require

18  invocation of the iTunes Store servers (steps 2, 5, 9, and 12), and one step in the AirPlay Version 1

19  session which requires invocation of the iTunes Store servers (step 2). Apple Mot. at 9-10.

20         During the claim construction process, the Court was not asked to construe the term "The

21  CPP is invoked." However, the Court agrees with Apple that based on the language of the patent

22  and Aylus's statements during the *inter partes* review process, dependent claims 2 and 21 require

23  that only the CPP logic is invoked to negotiate media content delivery.

24         First, the Court looks at the claim language. Independent claims 1 and 20 read: "invoking

25  the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS

26  and the MR if one of the MS and MR are not in communication with the UE via a local wireless

27  network . . . ." In contrast, dependent claims 2 and 21 read: "The method of claim 1, wherein the

28  CPP logic is invoked to negotiate media content delivery between the MS and the MR if the MS

and MR are both in communication with the UE via a local wireless network." Based on this

language, the independent and dependent claims are distinguishable by whether both the CPP

logic and the CP logic negotiate media content delivery (independent claims 1 and 20) or if only

the CPP logic negotiates media content delivery (dependent claims 2 and 21), depending on

whether the MS and MR are in communication with the UE. To read dependent claims 2 and 21

as encompassing both the invocation of CPP logic and the invocation of CPP logic and CP logic

would render this distinction meaningless. *See Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d

1361, 1368 (Fed. Cir. 2005) ("The doctrine of claim differentiation stems from 'the common sense

notion that different words or phrases used in separate claims are presumed to indicate that the

claims have different meanings and scope."); *see also Merck & Co. v. Teva Pharms. USA, Inc.*,

395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of

the claim is preferred over one that does not do so."); *Elekta Instrument S.A. v. O.U.R. Sci. Int'l,

Inc.*, 214 F..3d 1302, 1307 (Fed. Cir. 2000) (construing claim to avoid rendering the 30 degree

claim limitation superfluous).

The patent specification also makes this distinction, explaining that "where the UE is in the

proximity of both the desired MS and the desired MR and can communicate with them via a

[Personal Area Network], such as Wi-Fi, the CPP in the UE negotiates the association between the

MS and MR. In this case, *there is no need to involve the CP* in the SN, since this would involve

unnecessary use of wireless bandwidth." '412 Patent col. 17 ll. 50-55 (emphasis added). *See

Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("The claims, of course, do not stand

alone. Rather, they are part of a fully integrated written instrument, consisting principally of a

specification that concludes with the claims. For that reason, claims must be read in view of the

specification, of which they are a part. As we stated in *Vitronics*, the specification is always

highly relevant to the claim construction analysis.") (quotations omitted). The specification here

is consistent with the plain language of the subject claims and provides persuasive confirmation of

the Court's interpretation. *Cf. Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356,

1361 (Fed. Cir. 2015) (explaining that where the claim language has a plain meaning, the

specification plays a more limited role because "unless there is a disclaimer or redefinition,

United States District Court
For the Northern District of California

7

1  whether explicit or implicit, the proper construction of any claim language must, among other

2  things, stay true to the claim language, and, in order to avoid giving invention-defining effect to

3  specification language included for other descriptive and enablement purposes, the court's focus

4  remains on understanding how a person of ordinary skill in the art would understand the claim

5  terms.") (quotations omitted).

6        Second, this distinction is confirmed by Aylus's preliminary responses to Apple's *inter*

7  *partes* review petitions of the '412 patent and the PTAB's adjudication of the petition.  In this

8  regard, Aylus's statements are akin to a prosecution disclaimer.  Under that doctrine, "[t]he

9  patentee is held to what he declares during the prosecution of his patent. *Gillespie v. Dywidag*

10  *Sys. Int'l, USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007); *see also TomTom, Inc. v. Adolph*, 790 F.3d

11  1315, 1325 (Fed. Cir. 2015) ("where the patentee has unequivocally disavowed a certain meaning

12  to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary

13  meaning of the claim congruent with the scope of the surrender"); *Phillips*, 415 F.3d at 1317

14  ("Like the specification, the prosecution history provides evidence of how the PTO and the

15  inventor understood the patent.").[1]  In challenging all of the '412 patent claims, Apple argued that

16  the claims were obvious over prior art, particularly the UPnP design. *See* IPR Decision at 2-3.  In

17  its response, Aylus explained that the challenged claims require "determining the 'network

18  context' of the UE (*i.e.*, the networks available to the UE) and the 'network connectivity' of the

19  MS and MR (*i.e.*, the networks through which the UE can communicate with the MS and MR).

20  Buergi Dec., Exh. 4 (IPR2014-01565 Resp.) at 4; Exh. 5 (IPR2014-01566 Resp.) at 4.  For

21  example:

---

[1] Other courts in this District have noted that prosecution disclaimer has viability in *in partes* review proceedings, even though such proceedings are technically an adjudicative proceeding rather than an examination.  *See, e.g.*, *Evolutionary Intelligence, LLC v. Spring Nextel Corp.*, No. C-13-4513, 2014 U.S. Dist. LEXIS 139066, at *20 (N.D. Cal. Sept. 26, 2014) ("The IPR proceedings will also add to the '536 Patent's prosecution history.  Prosecution history is an important part of the intrinsic record relevant to claim construction."); *Pragmatus AV, LLC v. Yahoo! Inc.*, No. C-13-cv-1176 EMC, 2014 U.S. Dist. LEXIS 65813, at *14-15 (N.D. Cal. May 13, 2014) ("Under Federal Circuit law, comments made by a patent holder during inter partes reexamination proceedings can limit claim scope.  The same should be true now that inter partes review, rather than inter partes reexamination, is in effect."); *Samuels v. TriVascular Corp.*, No. 13-cv-2261-EMC, 2015 U.S. Dist. LEXIS 153437, at *16-17 n.3 (N.D. Cal. Nov. 12, 2015) (same).

United States District Court
For the Northern District of California

8

> Specifically, for claims 1 and 20, if . . . it is determined that "one of the MS and MR are not in communication with the UE via a local wireless network" the "CPP logic and the CP logic are both invoked["] and will "cooperatively negotiate media content delivery between the MS and the MR." If, however, "the MS and MR are both in communication with the UE via a local wireless network, then **only** "the CPP is invoked to negotiate media content delivery between the MS and the MR." [Claims 2 and 21].

IPR2014-01565 at 34-35 (emphasis added); IPR2014-01566 at 33 (emphasis added); *see also* IPR2014-01565 Resp. at 4; IPR2014-1566 Resp. at 4 (if neither (or both) the MS or the MR is in communication with the UE via a local wireless network, "the challenged dependent claims require that only the control point logic (or only the control point proxy logic) be invoked . . . ."). Thus, Aylus argued that "the challenged claims require selectively invoking the CP logic and/or CPP logic based on whether the MS and/or MR can communicate with the UE through the local network." IPR2014-01565 Resp. at 4; IPR2014-1566 Resp. at 4.

Based on this distinction, the PTAB denied Apple's petition for *inter partes* review of claims 2 and 21. IPR Decision at 17-18. The PTAB explained that the Petition had relied on the UPnP design to meet the limitation of claims 1 and 20, which require that the CP and CPP logic cooperatively negotiate media content delivery between the MS and MR. *Id.* at 17. The Petition had then used the same evidence to show the UPnP Design also met the limitation of claims 2 and 21, despite the fact that those claims require that the "CPP logic *exclusively* handles the negotiation of media content delivery between the MS and MR." *Id.* at 18 (emphasis added). Because the Petition had already used the UPnP Design to show that both the CP and CPP logic cooperate to handle the negotiation of media content between the MS and MR (as required for claims 1 and 20), the PTAB stated, "[i]t [wa]s unclear from the Petition how UPnP design allegedly meets the *different* limitations of dependent claims 2 [and] 21 . . . in which . . . the CPP logic *exclusively* handles the negotiation of media content delivery between the MS and MR." *Id.* (emphasis added). In other words, the PTAB agreed with Aylus that claims 1 and 20 required both the CP and CPP logic to handle the negotiation of media content delivery between the MS and MR whereas claims 2 and 21 required only the CPP to handle that negotiation. The PTAB

United States District Court
For the Northern District of California

1  thus found that there was a reasonable likelihood that Apple would prevail in showing the

2  unpatentability of claims 1 and 20, but not claims 2 and 21 because of the different limitations.

3  Based on this distinction, the PTAB instituted *inter partes* review of all claims of the '412 patent,

4  except for dependent claims 2, 4, 21, and 23.[2]

5       Thus, given the claim language, the patent specification, Aylus's response to Apple's

6  petition, and the PTAB's decision,[3] the Court finds that claims 2 and 21 require that only the CPP

7  logic is invoked to negotiate media content delivery between the MS and the MR, in contrast to

8  claims 1 and 20 which require both the CP and CPP to negotiate media content delivery.

9       Aylus responds that by reading this limitation as barring any involvement by the CP logic,

10  Apple is improperly requesting the Court to rewrite the dependent claims to add a negative

11  limitation.  Docket No. 205-4 (Aylus Opp.) at 3.  First, Aylus argues that independent claims 1

12  and 20 use the term "comprising the acts of," and that Federal Circuit precedent views this "open

13  claim language" as signaling that "'the *entire* claim is presumptively open-ended.'"  *Id.* (quoting

14  *MagSil Corp. v. Hitachi Global Storage Tech., Inc.*, 687 F.3d 1377, 1383 (Fed. Cir. 2012))

15  (emphasis added by Plaintiff).  But while claims 1 and 20 do use the word "comprising," claims 2

16  and 21 are dependent claims that have a more limited scope than claims 1 and 20, as explained in

17  Aylus's response to Apple's *inter partes* review petition.  *See* IPR2014-1565 Resp. at 35;

18  IPR2014-1566 Resp. at 33; *see also* IPR2014-1565 Resp. at 4; IPR2014-1566 Resp. at 4 at 4

19  ("certain of the challenged dependent claims require that only the control point logic (or only the

20  control point proxy logic) be invoked if it is determined that neither (or both) the MS or the MR

21  are in communication with the UE via the local wireless network"); *compare with Dippin' Dots,*

22

23  _____

[2] Dependent claims 4 and 23, which are not at issue in this suit, require that the CP logic

24  exclusively handles the negotiation of media content delivery between the MS and the MR.

25  [3] The PTAB currently applies "the broadest reasonable interpretation" standard in *inter partes*
   review, an issue that is now under review by the Supreme Court.  *See In re Cuozzo Speed Techs.,*

26  *LLC*, 793 F.3d 1268, 1275-79 (Fed. Cir. 2015) (explaining history of the "broadest reasonable
   interpretation" standard and applicability in *inter partes* review), *cert granted*, 84 U.S.L.W. 3218

27  (U.S. Jan. 15, 2016) (No. 15-446).  However, the PTAB's conclusion was not based on the
   application of the broad standard of review, but rested on the distinction that Aylus itself

28  articulated in its response to Apple's petition.

United States District Court
For the Northern District of California

10

United States District Court
For the Northern District of California

1    *Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007) ("The presumption raised by the term

2    'comprising' does not reach into each of the six steps to render every word and phrase therein

3    open-ended -- especially where, as here, the patentee has narrowly defined the claim term it now

4    seeks to have broadened"). Thus, the term "comprising" in the independent claims does not

5    render dependent claims 2 and 21 so open-ended as to include both the invocation of the CPP and

6    the invocation of the CP and CPP in negotiating media content delivery.

7        Next, Aylus argues that its statements to the PTAB stated that "only the CPP logic ***handles***

8    the negotiation of media content delivery and that the CP logic is not require to participate in the

9    handling," as it is in claims 1 and 20. Aylus Opp. at 4. This would not preclude the CPP logic

10   from communicating with or utilizing the CP logic, as long as it is the CPP logic that "handles"

11   the negotiations. *Id.* But, as pointed out by Apple during the hearing herein, the claims do not

12   contain the word "handle." Nor did Aylus use the word "handle" in its response to Apple's

13   petition for *inter partes* review, when Aylus explained that "only 'the CPP is invoked to negotiate

14   media content delivery between the MS and the MR.' [Claims 2 and 21]." IPR2014-1565 Resp. at

15   35; IPR2014-1566 Resp. at 33. Even if the Court was to read in the word "handle" into the claim,

16   Aylus has not explained the practical effect of incorporating this word with the claims, and how it

17   would be distinguished from the plain language of claims 2 and 21.

18       During the hearing on this matter, Aylus essentially conceded that dependent claims 2 and

19   21 require that only the CPP logic is invoked to negotiate media content delivery. *See* Docket No.

20   232 at 32:11-15.[4] However, Aylus argued that in the context of an AirPlay session, the CP logic is

21   not invoked to negotiate media content delivery because everything the CP logic does is in

22   response to the CPP, such that the CP is passive while the CPP is the exclusive active agent. In

23   short, Aylus contends steps where the CP is passive are not included as part of the negotiation of

24   media content delivery. *See* Docket No. 232, 46:23-47:10.[5]

25   

26   [4] THE COURT: So what's important about claim 2 is that not just the facilitation but the
     negotiation is being done not cooperatively but solely by the CPP logic.
27   MR. THAKUR: Right. The CP is asking the question and getting the response.

28   [5] THE COURT: So let me make sure I understand your current position . . . . You don't take issue
     with the CPP logic being exclusively the active agent not the passive agent. It's that -- so even if

11

**Confidential Material Redacted**

However, even if the CP in a sense acts passively, Aylus's argument that the CP is not invoked to negotiate media content delivery is at odds with the testimony of Aylus's own expert, Dr. Schonfeld. During his deposition, Dr. Schonfeld was asked whether steps 2, 5, 9, and 12 for AirPlay from the Cloud and step 2 for AirPlay Version 1 were part of the negotiation of media content delivery. All of these steps clearly require action by the CP, including actions between the CP and MR only, *i.e.*, steps 5 and 9, or performed only by the CP, *i.e.*, step 12.[6] Dr. Schonfeld testified that each of these steps was part of the negotiation of media content delivery. Buergi Dec., Exh. 8 at 139:3-17 (agreeing that step 2 is part of the negotiation of media content delivery); 139:22-141:12 (agreeing that step 5 is part of the negotiation of media content delivery); 141:17-142:17 (agreeing that step 9 is part of the negotiation of media content delivery); 142:23-144:1 (agreeing that step 12 is part of the negotiation of media content delivery); 152:3-13 (agreeing that step 2 of AirPlay Version 1 is part of the negotiation of media content delivery). In sum, whereas dependent claims 2 and 21 require that only the CPP logic be invoked to negotiate media content delivery, Aylus's expert admits that both versions of AirPlay require steps that invoke the CP (and the CPP) to negotiate media content delivery. Thus, Apple does not perform dependent claims 2 and 21. Accordingly, Apple is entitled to summary judgment of non-infringement of those claims.[7]

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Apple's motion for summary judgment of

---

we were to construe claim 2 that way, you're saying that there's still infringement because that's exactly what's happening with the Apple product?
MR. THAKUR: That's correct.
THE COURT: The CP, even with all these steps, is really not involved in the negotiation/coordination. It's just sitting there as a passive valve or whatever.
MR. THAKUR: That's correct.

[6] While step 2 involves the CPP (the iOS device), it is only to accept the "play-info" response sent by the CP (the ▮▮▮▮▮ server in the iTunes Store).

[7] Apple also raises arguments of non-infringement based on whether all of the claimed method steps are either performed by or attributable to Apple and whether the accused Apple products include a "proxy" as construed by the Court, as well as whether the asserted claims' conditional limits have patentable weight. *See* Apple Mot. at 2. Because the Court has resolved the motion on Apple's first argument, it does not address these remaining contentions.

12

United States District Court
For the Northern District of California

non-infringement. Having found that Apple has not infringed on the '412 patent, Aylus's motion

for partial summary judgment on invalidity, Apple's motion to exclude expert testimony, and

Aylus's motion to exclude expert testimony are **DENIED** as moot.

This order disposes of Docket Nos. 180, 182, 185, and 188.

The Clerk is instructed to enter judgment and close the file.

**IT IS SO ORDERED**.

Dated: January 21, 2016

EDWARD M. CHEN
United States District Judge

1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    AYLUS NETWORKS, INC.,                Case No.  13-cv-04700-EMC
8                    Plaintiff,
                                          **CERTIFICATE OF SERVICE**
9         v.
10   APPLE INC.,
11                   Defendant.
12

13        I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S.

14   District Court, Northern District of California.

15        That on January 21, 2016, I SERVED a true and correct copy(ies) of the attached, by

16   placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by

17   depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery

18   receptacle located in the Clerk's office.

19
20        Amardeep Lal Thakur
          Quinn Emanuel Urquhart & Sullivan, LLP
21        865 South Figueroa Street
          10th Floor
22        Los Angeles, CA 90017

23        Christine Kerba Corbett
          DLA Piper US LLP
24        2000 University Avenue
          East Palo Alto, CA 94303-2215
25
          Eduardo J Blanco
26        DLA Piper LLP
          2000 University Avenue
27        Palo Alto, CA 94303

28

United States District Court
Northern District of California

**Appx14**

Erik R. Fuehrer
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2214

Hannah Cannom
Walker Stevens Cannom LLP
550 South Hope Street
Suite 460
Los Angeles, CA 90071

Harold A. Barza
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017-2543

Jonathan H Hicks
2000 University Avenue
East Palo Alto, CA 94303

Joseph B. Martin
Quinn Emanuel
50 California Street, Suite 22
San Francisco, CA 94111

Joshua Lee Sohn
Quinn Emmanuel Urqhart Oliver Hedges
50 California Street
22nd Floor
San Francisco, CA 94111

Mark Fowler
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303

Robert Buergi
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303

Robert Chen Williams
DLA Piper LLP US
401 B Street, Suite 1700
San Diego, CA 92101

Vincent Martin Pollmeier
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

**Appx15**

1    Dated: January 21, 2016

2

3                                   Susan Y. Soong
                                    Clerk, United States District Court
4

5                                   By:  Leni Doyle-Hickman, Deputy Clerk to the
                                    Honorable EDWARD M. CHEN
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**Appx16**

Harold A. Barza
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017-2543

13-cv-04700-EMC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYLUS NETWORKS, INC., | Case No. 13-cv-04700-EMC |
| Plaintiff, | |
| v. | **JUDGMENT** |
| APPLE INC., | |
| Defendant. | |

On January 21, 2016, the Court granted Defendant's motion for summary judgment. Pursuant to Federal Rule of Civil Procedure 58, the Court hereby **ENTERS** judgment in favor of Defendant. The Clerk of Court shall close the file in this matter.

**IT IS SO ORDERED.**

Dated: January 21, 2016

_____
EDWARD M. CHEN
United States District Judge

Case 3:16-cv-05470 Document 28 Filed 05/09/16 Page 1 of 24
US00RE44412E

(19) **United States**

(12) **Reissued Patent**

Naqvi et al.

(10) Patent Number: **US RE44,412 E**

(45) Date of Reissued Patent: **Aug. 6, 2013**

(54) **DIGITAL HOME NETWORKS HAVING A CONTROL POINT LOCATED ON A WIDE AREA NETWORK**

(75) Inventors: **Shamim A. Naqvi**, Morristown, NJ (US); **Prasad S. Dorbala**, Lexington, MA (US); **Ellis L. Wong**, Lexington, MA (US); **Mahesh N. Ganmukhi**, Carlisle, MA (US)

(73) Assignee: **Aylus Networks, Inc.**, Westford, MA (US)

(21) Appl. No.: **13/232,432**

(22) Filed: **Sep. 14, 2011**

**Related U.S. Patent Documents**

Reissue of:

(64) Patent No.: **7,724,753**
Issued: **Mar. 25, 2010**
Appl. No.: **11/370,793**
Filed: **Mar. 8, 2006**

U.S. Applications:

(63) Continuation-in-part of application No. 11/166,407, filed on Jun. 24, 2005, now Pat. No. 7,792,528, and a continuation-in-part of application No. 11/282,924, filed on Nov. 18, 2005, now abandoned.

(51) **Int. Cl.**
*H04L 12/56* (2006.01)

(52) **U.S. Cl.**
USPC .......................................... **370/410**; 709/227

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,736,407 A | 4/1988 | Dumas | |
| 4,925,311 A | 5/1990 | Neches et al. | |
| 6,014,706 A * | 1/2000 | Cannon et al. | 709/231 |
| 6,018,662 A | 1/2000 | Periyalwar et al. | |
| 6,032,053 A | 2/2000 | Schroeder et al. | |
| 6,047,194 A | 4/2000 | Andersson | |
| 6,061,572 A | 5/2000 | Laiho | |
| 6,067,529 A | 5/2000 | Ray et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 1435748 | 7/2004 |
|---|---|---|
| EP | 1545129 A1 | 6/2005 |

(Continued)

OTHER PUBLICATIONS

European Search Report for European Patent Application No. 08769004.6 mailed Jun. 21, 2012. 7 pages.

(Continued)

*Primary Examiner* — Brian Roberts

(57) **ABSTRACT**

A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area IMS network for control. The method involves: provisioning a serving node in the IMS network with control point (CP) logic that includes logic to negotiate media content delivery with a least one of an MS and an MR; provisioning a user endpoint (UE) device of the IMS network with control point proxy (CPP) logic that includes logic to negotiate media content delivery and VCR controls to control media presentation; in response to a media content delivery request, invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between an MS and an MR that uses local wireless or land line connections when possible in order to minimize wide area bandwidth usage.

**33 Claims, 17 Drawing Sheets**



# US RE44,412 E

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,374,112 | B1 | 4/2002 | Widegren et al. |
| 6,574,326 | B1 | 6/2003 | Wong et al. |
| 6,608,832 | B2 | 8/2003 | Forslow |
| 6,650,705 | B1 | 11/2003 | Vetro et al. |
| 6,665,711 | B1 | 12/2003 | Boyle et al. |
| 6,675,196 | B1 | 1/2004 | Kronz |
| 6,694,145 | B2 | 2/2004 | Riikonen et al. |
| 6,782,412 | B2 | 8/2004 | Brophy et al. |
| 6,847,632 | B1 | 1/2005 | Lee et al. |
| 6,857,021 | B1 | 2/2005 | Schuster et al. |
| 6,888,828 | B1 | 5/2005 | Partanen et al. |
| 6,950,655 | B2 | 9/2005 | Hunkeler |
| 7,024,198 | B2 | 4/2006 | Knaebchen et al. |
| 7,076,554 | B1 | 7/2006 | Kobayashi |
| 7,155,305 | B2 * | 12/2006 | Hayes et al. .................. 700/224 |
| 7,194,235 | B2 | 3/2007 | Nykanen et al. |
| 7,277,416 | B1 | 10/2007 | Chang et al. |
| 7,301,938 | B2 | 11/2007 | Ejzak |
| 7,519,075 | B2 | 4/2009 | Tu |
| 7,637,424 | B2 | 12/2009 | Silverbrook et al. |
| 7,640,038 | B2 | 12/2009 | Reddy |
| 7,720,489 | B2 | 5/2010 | Engelhart, Sr. |
| 7,729,298 | B2 | 6/2010 | Velagaleti et al. |
| 7,856,226 | B2 | 12/2010 | Wong et al. |
| 7,864,936 | B2 | 1/2011 | Naqvi et al. |
| 8,065,402 | B2 | 11/2011 | Chen et al. |
| 8,170,534 | B2 | 5/2012 | Naqvi et al. |
| 2002/0059416 | A1 | 5/2002 | Tuunanen |
| 2002/0064274 | A1 | 5/2002 | Tuunanen et al. |
| 2002/0140726 | A1 | 10/2002 | Schwartz et al. |
| 2002/0181462 | A1 | 12/2002 | Surdila et al. |
| 2003/0026245 | A1 | 2/2003 | Ejzak |
| 2003/0027569 | A1 | 2/2003 | Ejzak |
| 2003/0027595 | A1 | 2/2003 | Ejzak |
| 2003/0055974 | A1 | 3/2003 | Brophy et al. |
| 2003/0134636 | A1 * | 7/2003 | Sundar et al. ................. 455/432 |
| 2003/0134640 | A1 | 7/2003 | Kim et al. |
| 2003/0144008 | A1 | 7/2003 | Rehkopf |
| 2003/0193426 | A1 * | 10/2003 | Vidal ............................ 341/176 |
| 2003/0210683 | A1 | 11/2003 | Bais et al. |
| 2004/0008669 | A1 | 1/2004 | Bos et al. |
| 2004/0019539 | A1 | 1/2004 | Raman et al. |
| 2004/0019901 | A1 | 1/2004 | Spio |
| 2004/0043766 | A1 | 3/2004 | Sashihara |
| 2004/0048612 | A1 | 3/2004 | Virtanen et al. |
| 2004/0062230 | A1 | 4/2004 | Taylor et al. |
| 2004/0068574 | A1 | 4/2004 | Costa Requena et al. |
| 2004/0076145 | A1 | 4/2004 | Kauhanen et al. |
| 2004/0083195 | A1 | 4/2004 | McCord et al. |
| 2004/0107143 | A1 * | 6/2004 | Niemi ............................. 705/26 |
| 2004/0127251 | A1 | 7/2004 | Thakkar et al. |
| 2004/0162892 | A1 | 8/2004 | Hsu |
| 2004/0193700 | A1 | 9/2004 | Westman et al. |
| 2004/0193725 | A1 | 9/2004 | Costa-Requena et al. |
| 2004/0205212 | A1 | 10/2004 | Huotari et al. |
| 2004/0218571 | A1 | 11/2004 | Pascazi |
| 2004/0219912 | A1 | 11/2004 | Johansson et al. |
| 2004/0249887 | A1 | 12/2004 | Garcia-Martin et al. |
| 2004/0249962 | A1 | 12/2004 | Lecomte |
| 2004/0252673 | A1 | 12/2004 | Ejzak et al. |
| 2004/0261116 | A1 | 12/2004 | Mckeown et al. |
| 2005/0021494 | A1 | 1/2005 | Wilkinson |
| 2005/0025163 | A1 | 2/2005 | Christie |
| 2005/0043020 | A1 | 2/2005 | Lipsanen et al. |
| 2005/0047399 | A1 | 3/2005 | Lee et al. |
| 2005/0050194 | A1 | 3/2005 | Honeisen et al. |
| 2005/0058125 | A1 | 3/2005 | Mutikainen et al. |
| 2005/0063329 | A1 | 3/2005 | Lee et al. |
| 2005/0080390 | A1 | 4/2005 | Kuusinen et al. |
| 2005/0089020 | A1 | 4/2005 | Ahlback et al. |
| 2005/0114493 | A1 * | 5/2005 | Mandato et al. ............. 709/223 |
| 2005/0180394 | A1 | 8/2005 | Kautz et al. |
| 2005/0190772 | A1 | 9/2005 | Tsai et al. |
| 2005/0213606 | A1 | 9/2005 | Huang et al. |
| 2005/0227681 | A1 | 10/2005 | Li |
| 2005/0237933 | A1 | 10/2005 | Marjelund et al. |
| 2005/0243870 | A1 | 11/2005 | Balogh et al. |
| 2005/0245261 | A1 * | 11/2005 | Ejzak ............................ 455/436 |

| | | | |
|---|---|---|---|
| 2005/0271011 | A1 | 12/2005 | Alemany et al. |
| 2005/0286531 | A1 | 12/2005 | Tuohino et al. |
| 2006/0015812 | A1 | 1/2006 | Cunningham et al. |
| 2006/0025151 | A1 | 2/2006 | Karaoguz et al. |
| 2006/0080407 | A1 * | 4/2006 | Rengaraju ..................... 709/219 |
| 2006/0083199 | A1 | 4/2006 | Yang |
| 2006/0104262 | A1 | 5/2006 | Kant et al. |
| 2006/0114987 | A1 | 6/2006 | Roman |
| 2006/0120287 | A1 | 6/2006 | Foti et al. |
| 2006/0120339 | A1 | 6/2006 | Akiyama et al. |
| 2006/0126562 | A1 | 6/2006 | Liu |
| 2006/0140150 | A1 | 6/2006 | Olvera-Hernandez et al. |
| 2006/0149811 | A1 * | 7/2006 | Bennett et al. ............... 709/203 |
| 2006/0155814 | A1 | 7/2006 | Bennett et al. |
| 2006/0155850 | A1 * | 7/2006 | Ma et al. ...................... 709/226 |
| 2006/0164550 | A1 | 7/2006 | Yoshimoto et al. |
| 2006/0209768 | A1 | 9/2006 | Yan et al. |
| 2006/0221903 | A1 | 10/2006 | Kauranen et al. |
| 2006/0246903 | A1 | 11/2006 | Kong et al. |
| 2006/0250578 | A1 * | 11/2006 | Pohl et al. .................... 351/210 |
| 2006/0256751 | A1 | 11/2006 | Jagadeesan et al. |
| 2006/0258394 | A1 | 11/2006 | Dhillon et al. |
| 2006/0262806 | A1 | 11/2006 | Bouazizi |
| 2006/0291412 | A1 | 12/2006 | Naqvi et al. |
| 2006/0291419 | A1 | 12/2006 | McConnell et al. |
| 2006/0291437 | A1 | 12/2006 | Naqvi et al. |
| 2006/0291484 | A1 | 12/2006 | Naqvi et al. |
| 2006/0291487 | A1 | 12/2006 | Naqvi et al. |
| 2006/0291488 | A1 | 12/2006 | Naqvi et al. |
| 2006/0291489 | A1 | 12/2006 | Naqvi et al. |
| 2007/0008913 | A1 | 1/2007 | Naqvi et al. |
| 2007/0008951 | A1 | 1/2007 | Naqvi et al. |
| 2007/0014281 | A1 | 1/2007 | Kant |
| 2007/0033286 | A1 | 2/2007 | Min |
| 2007/0050510 | A1 | 3/2007 | Jiang |
| 2007/0053343 | A1 | 3/2007 | Suotula et al. |
| 2007/0066347 | A1 | 3/2007 | Silverbrook et al. |
| 2007/0067807 | A1 | 3/2007 | O'Neil |
| 2007/0143488 | A1 * | 6/2007 | Pantalone ..................... 709/230 |
| 2007/0143489 | A1 * | 6/2007 | Pantalone ..................... 709/230 |
| 2007/0155310 | A1 | 7/2007 | Borcic et al. |
| 2007/0165599 | A1 | 7/2007 | Skog et al. |
| 2007/0174471 | A1 | 7/2007 | Van Rossum |
| 2007/0197227 | A1 | 8/2007 | Naqvi et al. |
| 2007/0207782 | A1 | 9/2007 | Tran |
| 2007/0217349 | A1 | 9/2007 | Fodor et al. |
| 2008/0043717 | A1 | 2/2008 | Bellora et al. |
| 2008/0092178 | A1 | 4/2008 | McNamara et al. |
| 2008/0130637 | A1 | 6/2008 | Kant et al. |
| 2008/0162637 | A1 | 7/2008 | Adamczyk et al. |
| 2008/0291905 | A1 | 11/2008 | Chakravadhanula et al. |
| 2009/0092109 | A1 * | 4/2009 | Cagenius et al. ............. 370/338 |
| 2011/0164563 | A1 | 7/2011 | Naqvi et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1672893 A1 | 6/2006 |
| WO | WO-0154401 A1 | 7/2001 |
| WO | WO-2007/010070 A2 | 1/2007 |
| WO | WO-2007/117730 A2 | 10/2007 |

## OTHER PUBLICATIONS

European Search Report for European Patent Application No. EP08746133 mailed Jun. 25, 2010. 8 pages.

GSM Association: "Video Share Service Definition 2.0." Mar. 27, 2007. XP002585831. http://www.gsmworld.com/documents/se41.pdf>. Retrieved on Jun. 2, 2010. 28 pages.

International Search Report and Written Opinion, International Application No. PCT/US08/60656, Aylus Networks, Inc., Jul. 2, 2008, 8 pages.

International Search Report for Application No. PCT/US08/57367, Aylus Networks, Inc., Aug. 8, 2008, 7 pages.

International Search Report for International Application No. PCT/US07/04854, Aylus Networks, Inc., Jan. 31, 2008 (3 pages).

International Search Report, International Application No. PCT/US06/24619, date mailed Feb. 14, 2007, 2 pages.

International Search Report, International Application No. PCT/US06/24624, mailed Apr. 3, 2007, 1 pages.

**US RE44,412 E**

Page 3

Nokia Corporation: "Video Sharing, Enrich Your Voice Call with Video." Nov. 1, 2004. XP002336424. 12 pages.
OSGi Service Platform, Mar. 2003, The Open Services Gateway Initiative, Release 3, pp. 345-346, 505, 513-526.*

Definition of 'proxy' from dictionary.com.*

* cited by examiner

Figure 1



# Figure 2



# Figure 3





Figure 4



Figure 5

start
500

receive service
request code
502

map service request code
(all codes, e.g., mapped to
provisioning logic server)
504

provisioning logic
server accesses call
model database
506

call model database
provides call model
for specified user
508

construct NFC and
new call model for
user
510

end
599

# Figure 6



service
requests 608

service
responses 610

408



Figure 7

# Figure 8



## Figure 9



Figure 10





Figure 11



Figure 12

Figure 13

1302
start
1304
service already in PAN?
NO
YES
1322
service joins network
1324
service broadcasts advertisement message
1326
service manager (SM) receives advertisement message with cache expiry value and description URL
1306
SM joins PAN
1308
SM broadcasts search message
1310
service available in PAN?
YES
1312
service responds with message containing cache expiry and description URL
1314
SM retrieves description
1318
SM extracts presentation URL form description
1318
NO
SM displays presentation URL in browser user can now control the service
1320
SOAP messages are sent to service to control it
end



Figure 14

Media Adapter (UPnP Media Renderer Device)
UE (UPnP Control Point & Media Server Device)
P-CSCF
S-CSCF
Serving Node
Mobility Management AS
IMS Session Established
1401a. SSDP Advertise (NOTIFY)
1401b. SSDP Search (M_SEARCH)
1402. SSDP Response
1403. HTTP Get (Device Description Req)
1404. HTTP Response (Device Description XML)
1405. HTTP Get (Service Description Req)
1406. HTTP Response (Service Description XML)
1407. Media Adapter Device Associated



Figure 15

Media Adapter (UPnP Media Renderer Device)
UE (UPnP Control Point & Media Server Device)
P-CSCF
S-CSCF
Serving Node 408
Handoff Control AS 416
IMS Session Established
1501a. SSDP Advertise (NOTIFY)
1501b. SSDP Search (M_SEARCH)
1502. SSDP Response
1503. HTTP Get (Device Description Req)
1504. HTTP Response (Device Description XML)
1505. HTTP Get (Service Description Req)
1506. HTTP Response (Service Description XML)
1507. Media Adapter Device Associated
1508a. SIP RE-INVITE / SDP (Disc'd Device Info)
1508b. SIP RE-INVITE / SDP (Disc'd Device Info)
1508c. SIP RE-INVITE / SDP (Disc'd Device Info)
1509. Add Associated Device to .ME Framework
15010. Execute Relay Control Decision Logic
1511c. 200 OK SDP (Relay Trigger)
1511b. 200 OK SDP (Relay Trigger)
1511a. 200 OK SDP (Relay Trigger)
1512. SOAP: PrepareForConnection() (RTSP Streaming)
1513. SOAP: Connection Response
1514. RTSP DESCRIBE
RTSP response (SDP generated from .ME framework)
1515. RTSP SETUP
RTSP setup response
Streaming Svr Control
1516. SOAP: Play() (Play RTSP Stream)
1517. RTSP PLAY (SDP OoE)
Streaming Svr Control
RTP/UDP/IP Content
RTP/UDP/IP Content



# Figure 16

UPnP Media Renderer (w/ Remote IO Server)
UPnP Control Point & Remote IO Client (UE)
P-CSCF
S-CSCF
Serving Node 408
Handoff Control AS 614
IMS Session Established
1601a. SSDP Advertise (NOTIFY)
1601b. SSDP Search (M_SEARCH)
1602. SSDP Response
1603. HTTP Get (Device Description Req)
1604. HTTP Response (Device Description XML)
1605. HTTP Get (Service Description Req)
1606. HTTP Response (Service Description XML)
1607. Media Adapter Device Associated
1608a. SIP RE-INVITE / SDP (Disc'd Device Info)
1608b. SIP RE-INVITE / SDP (Disc'd Device Info)
1608c. SIP RE-INVITE / SDP (Disc'd Device Info)
1609. Added to Associated Device Map
1610. Handoff Control Decision Logic Executed
1611c. 200 OK SDP (Handoff Trigger)
1611b. 200 OK SDP (Handoff Trigger)
1611a. 200 OK SDP (Handoff Trigger)
1612. SOAP: Execute App Cmd (Initiate RTSP Streaming)
1613. SOAP: Execute App Response
1614. RTSP DESCRIBE
RTSP Response (SDP generated from .ME framework)
1615. RTSP SETUP
Rtsp setup response
Streaming Svr Control
1616. SOAP: Execute App Cmd (Play RTSP Stream)
1617. RTSP PLAY (SDP QoE)
Streaming Svr Control
RTP/UDP/IP Content
1618a. SIP RE-INVITE / SDP/QoE (Dis-engage Server Control)
1618b. SIP RE-INVITE / SDP/QoE (Dis-engage Server Control)
1618c. SIP RE-INVITE / SDP (Dis-engage Server Contol)



# Figure 17

Home Network for calling party
UE (UPnP Media Renderer)
UE (UPnP Media Server)
Handoff Control AS
Media Control AS
S-CSCF
MRFC
1701. Media Adapter Device Discovered
1702 RE-INVITE (UE Discovered Device Info SDP)[1]
1703. RE-INVITE (UE SDP)[1]
1704. Handoff to New Device Triggered
1705. 200 OK (Handoff Trigger SDP)[1]
1706. 200 OK (Handoff Trigger SDP)[1]
1707. ACK[1]
1708. ACK[1]
1709. SOAP PrepareForConnection() (RTSP Session)
1710. SOAP Response
1711. SOAP Play()
1712. RTSP DESCRIBE
1713. RTSP DESCRIBE
1715. RTSP describe response (Content Description) [SDP generated from .ME framework]
1714. RTSP describe response (Content Description)
1716. RTSP SETUP (SDP)
1717. RTSP SETUP (SDP)
1719. RTSP setup response (SDP with .ME framework info)
1718. RTSP setup response (SDP)
1720. Trans-coding for New Associated Device Triggered
1721. INVITE (UE SDP)[2]
1722. INVITE (UE SDP)[2]
1723. 200 OK (UE SDP)[2]
1724. 200 OK (UE SDP)[2]
1725. ACK [2]
1726. ACK [2]
1727. Trans-coding Setup
1728. RTSP PLAY (SDP QoE params)
1729. RTSP PLAY (SDP QoE params)
1730. RTSP play response
1729. RTSP play response
RTP Stream Content
RTP/UDP/IP Stream Content



**1**

## DIGITAL HOME NETWORKS HAVING A CONTROL POINT LOCATED ON A WIDE AREA NETWORK

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application *is a reissue of U.S. patent application Ser. No. 11/370,793, filed on Mar. 8, 2006, now U.S. Pat. No. 7,724,753, granted May 25, 2010, which* is a continuation-in-part of and claims priority under 35 U.S.C. §120 to the following applications, the contents of which are incorporated herein by reference in their entirety:

U.S. patent application Ser. No. 11/166,407, filed on Jun. 24, 2005, entitled Method and System For Provisioning IMS Networks With Virtual Service Organizations Having Distinct Service Logic, *now U.S. Pat. No. 7,792,528*;

U.S. patent application Ser. No. 11/282,924, filed Nov. 18, 2005, entitled IMS Networks with AVS Sessions with Multiple Access Networks*, abandoned*.

This application is related to U.S. patent application *Ser. No. 11/370,594, filed Mar. 8, 2006,* entitled "Associated Device Discovery in IMS Networks" [filed on even date herewith]*, abandoned*.

### BACKGROUND

1. Field of the Invention

The invention generally relates to IP Multimedia Subsystem (IMS) networks and, more specifically, to IMS users that use (perhaps multiple) discovered user endpoint devices.

2. Discussion of Related Art

Commonly deployed wireless communication networks, usually referred to as 2.5G networks, support both voice and data services. Typically, mobile handsets are connected to a Base Transceiver Station (BTS) using a Radio Access Network (RAN) that uses a modulation scheme such as CDMA (Code Division Multiple Access) or GSM (Global System for Mobile communications). The BTSs are connected via fixed links to one or more Base Station Controllers (BSCs), and the BSCs are aggregated into switches called Mobile Switching Centers (MSCs). The MSC is connected to the Public Land Mobile Network/Public Switched Telephone Network (PLMN/PSTN), typically through a gateway switch called the Gateway Mobile Switching Center (GMSC). Sometimes the term "core network" is used to collectively describe the MSC, GMSC and associated network elements. Voice traffic uses the so called circuit-switched paradigm of communications in which circuits are assigned, i.e., dedicated, to a call for its entire duration; the voice traffic is carried using Time Division Multiplexing (TDM) switching technology. Signaling traffic uses Signaling System 7 (SS7) typically as out of band circuits.

With the advent of Internet Protocol (IP) networking, IP data service is offered to wireless clients by an overlay data network in which a packet control function (PCF) is introduced at the BSC level to connect BSCs to an IP-routed network. The PCF is responsible for packetization of RAN traffic. On the inbound side (core network to RAN) the PCF takes IP packets and reorganizes them for transmission as frames over the radio transport protocol. On the outbound

**2**

side (RAN to core network) the PCF packetizes radio protocol frames to IP packets. Data connections are handled by this overlay network and the MSC is used primarily to handle circuit-switched voice calls.

The development of Voice over IP (VoIP) technology has resulted in the MSC being re-designed to handle packet-switched voice traffic along with existing circuit-switched traffic. This new architecture is called a soft switch network. The legacy switch is disaggregated into a control and multi-plicity of media gateway (MGW) components. The control component (sometimes called the soft switch) uses an open control protocol called the Media Gateway Control Protocol (MGCP) to manage the MGW. The MGW itself has the ability to accept both packet and circuit-switched traffic and convert one to the other, under the control of the soft switch. It is thus possible in 2.5G networks to carry both circuit-switched and packet-switched traffic.

It is widely believed that wireless communications will soon be dominated by multimedia services. This has resulted in new RAN technologies and the resulting networks are called 3G networks. The transition of 2.5G to 3G networks emphasizes packet traffic and new architectures have been proposed to handle multimedia sessions, such as Quality of Service (QoS).

A defining characteristic of 2.5G/3G multimedia services is that since the handset can send or receive IP data packets at any time, the IP context of the handset is maintained as long as the handset is powered on and connected to the network. This is in contrast to traditional telephony where the state of a connection is maintained only while a telephone call is in progress.

In particular, in 3G networks the services are to be provided by so-called Application Servers. Consequently the connection between the service logic and the application server is a "stateful" connection that needs to be maintained for the duration of the service being used. Hence a very large number of stateful connections need to be maintained between the application server complex, hosted in the application domain, and the service logic complex hosted in the service logic domain, in a network servicing a large number of subscribers. Such stateful connections that cross administrative domains have high networking costs and are difficult to maintain operationally.

Typical of proposals for 3G network architecture is the IP Multimedia Subsystem (IMS) architecture, shown in FIG. 1. IMS is independent of the type of access network; that is, it applies both to wireless and landline networks. Examples of access networks include various flavors of Wi-Fi networks, GPRS, and HSDPA networks. IMS uses Session Initiation Protocol (SIP) for control and signaling messages. SIP is an IP-based signaling protocol designed for multimedia communications. The IMS architecture introduces several control functions, i.e., functional entities, to manage the network. The legacy circuit-switched traffic is handled by an Inter-working Function called the BGCF (Breakout gateway control function). The MGW is controlled by a new function called the Media Gateway Control Function (MGCF), and the media processing functions are performed by the Media Resource Function Processor (MRFP), which is controlled by the Media Resource Control Function (MRCF).

The basic call server called the Call State Control Function (CSCF) is logically partitioned into three functional entities, the Proxy, Interrogating and Serving CSCF.

The Proxy Call State Control Function (P-CSCF) is the first contact point for the handset, also referred to herein as the User Entity (UE,) within IMS and provides the following functions:

**3**

1. Forward SIP register request received from the UE
2. Forward SIP messages received from the UE to the SIP server
3. Forward the SIP request or response to the UE
4. Detect and handle an emergency session establishment request
5. Generate Call Detail Records (CDRs)
6. Maintain Security Association between itself and each UE
7. Perform SIP message compression/decompression
8. Authorize bearer resources and QoS management

The Interrogating CSCF (I-CSCF) is mainly the contact point within an operator's network for all IMS connections destined to a subscriber of that network operator, or a roaming subscriber currently located within that network operator's service area. It provides the following functions:

1. Assign a S-CSCF to a user performing SIP registration
2. Route a SIP request received from another network towards the S-CSCF
3. Obtain from Home Subscriber Server (HSS) the Address of the S-CSCF
4. Forward the SIP request or response to the S-CSCF as determined above
5. Generate Call Detail Records

The Serving CSCF (S-CSCF) actually handles the session states in the network and provides the following functions:

1. Behave as SIP Registrar: accept registration requests and make its information available through the location server
2. Session control for the registered endpoints' sessions
3. Behave as a SIP Proxy Server: accept requests and service them internally or forward them on
4. Behave as a SIP User Agent: terminate and independently generate SIP transactions
5. Interact with application servers for the support of Services via the IMS Service Control (ISC) interface
6. Provide endpoints with service event related information
7. Forward SIP message to the correct CSCF
8. Forward the SIP request or response to a BGCF for call routing to the PSTN or CS Domain
9. Generate Call Detail Records

The P-CSCF is the first point of contact for a UE (handset) in an IMS network. The I-CSCF then helps in establishing which S-CSCF "owns" the UE.

FIG. 2 is a signaling diagram, showing the call flow for a UE when it first establishes contact with an IMS network. The UE sends a "register" request to the proxy (**201**, **202**). Assuming the proxy determines that the UE is registering from a visiting domain, it queries the DNS to find the I-CSCF in the UE's home domain (**203**). The proxy then sends the registration information to the I-CSCF (**204**). The HSS checks if the user is already registered and sends the address of the S-CSCF in response (**205**, **206**). An authentication process now ensues in which the UE is challenged to provide valid authentication vectors (**207-211**). Once the authentication procedure is completed (**212-218**), the S-CSCF informs the HSS that the UE is registered (**219-225**).

The HSS provides initial filter codes (IFCs) to the S-CSCF. The IFC, in effect, maps the service codes with various application servers (ASs). Thus, if the UE later issues a service request or if the service is otherwise triggered the mapped AS will be invoked. The IFC is effectively the "call model" for the UE. These call models are static objects downloaded during registration from the HSS. Every UE in the domain of the S-CSCF will, if they have the services enabled at all, have the same application servers (ASs) mapped to the same services. For example, push-to-talk service for each and every UE

**4**

having such service will point to the same AS or point to an AS with identical service logic to provide the identical push-to-talk functionality.

Registered UEs may use services by initiating a new session establishment procedure depicted in FIG. 3. The Figure shows a session establishment request originating with a S-CSCF (called O-SCSCF) or I-CSCF (called O-ICSCF). This request is routed to the "terminating" S-CSCF (T-SCSCF), which consults the callee's service profile (**301**). Based on the service profile of the originating registered user, the T-SCSCF sends an IMS service control request (ISC) to the corresponding application server (T-AS) that can handle this service request (**302**). The T-AS provides the service to the callee and terminates the session (**303**) and the S-CSCF terminates the application activation process (**304**).

As an illustrative example, consider the case of voice mail in which callers to a certain user may leave a voice message if the called user does not respond to the call. This voice mail service is provided by an application server (AS) dedicated to this service and having service logic to provide such functionality. The S-CSCF transfers control to the voice mail application server when a certain service point trigger (SPT) occurs, i.e., an event occurs that causes a trigger within the SPT to "fire." The IFCs that provide trigger points to the service logic of the S-CSCF are downloaded into the S-CSCF during user registration at session initiation time and remain fixed for the duration of the session. The service profile described above that is consulted by the T-SCSCF is a static object in the sense that the information contained in it is defined once at the time of service inception.

The coverage area of a service provider is typically partitioned into geographical regions called cells. Each cell is served by a BTS, i.e., the BTS radiates energy within a cell. Allocating frequencies to cells in a judicious manner allows re-use of frequencies and, hence, to more efficient use of the operator's spectrum allocation. As a mobile handset roams across cell boundaries, its reception of the signal being radiated by the BTS varies. A crucial component of wireless communication networks is the ability to hand off a moving handset from one BTS to a neighboring BTS. Various handoff algorithms are known in the literature. Broadly speaking, all handoff technologies fall into one of two types: hard handoff, and soft handoff.

In hard handoffs the connection between the current BTS and the handset is severed and a new connection is established between a new BTS and the handset while a telephone call is ongoing. The decision to sever the old connection and start a new connection is based on a pre-determined threshold value of the received signal. In soft handoff technologies the signal strength from two (or more) BTS are compared and the one that has the higher value is selected. The main advantage that handoffs provide is that ongoing calls remain connected as the handset roams in the coverage area. Since the region in which a BTS radiates is limited, a handset that roams out of the range of a BTS will lose connection with the BTS and hence any ongoing call will be dropped. Handoffs ensure that the handset remains connected to some BTS and any ongoing calls do not get dropped.

As the bandwidth provided by wireless networks increases, it is now possible to send and receive multimedia information to handsets. Thus, handsets are no longer used only to make and receive telephone calls. Rather handsets are envisioned to send and receive multimedia information such as video clips, audio files, etc. Handsets have become general purpose computing and communication devices. Wireless networks are now expected to provide broadcast content, video telephony,

US RE44,412 E

5

multimedia conferencing, video streaming services, file upload and download services, and interactive multimedia services.

However, the availability of network coverage supporting multimedia services is highly uneven. In some areas several networks may be available simultaneously that could be used by a handset, whereas in other regions there may be insufficient coverage to support a given network service. For example, at a given location one may have several short-range Wi-Fi or WiMax networks, or 1xRTT EVDO, that could provide multimedia services to a handset (assuming that the handset is capable of supporting multiple modulation schemes).

A handset, however, has an inherent disadvantage since its form factor is generally not suitable for long term use as a display device. The small size of the handset display screen is not amenable to long duration sessions or sessions in which the handset is jointly viewed by several users. In such cases it would be desirable to view the multimedia services on a larger LCD or a TV display device. Many such devices support LAN connections directly or indirectly via commercially available media plugs. Moreover, such devices may also support short range wireless networks such as Wi-Fi and WiMax.

The wireless world is increasingly becoming a world of multiple networks. Some are short range and others support longer ranges of coverage. The information-carrying capacity of these networks varies widely from network to network. Handsets increasingly support multiple wireless connections, including both short range networks such as Bluetooth and Wi-Fi, and long range cellular networks.

SUMMARY

The invention provides systems and methods for implementing digital home networks having a control point located on a wide area network. The control point may be implemented on a serving node connected to the wide area network, and have the capability of working in conjunction with one or more control point proxies that are located in handsets connected to a 3G wireless network, or in remote control units located within the home. The control point and control point proxies cooperatively negotiate media delivery from a user-selected media server, such as a home stereo or DVD player, to a user-selected media renderer, such as a TV display or the display on a handset. The control point proxies also include VCR controls for controlling the presentation of the selected media delivery.

In general, in one aspect, the invention features a method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area IMS network for control. The method involves: provisioning a serving node in the IMS network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of an MS and an MR; provisioning a user endpoint (UE) device of the IMS network with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of an MS and an MR, (ii) logic to cooperate with CP logic to negotiate media content delivery between an MS and an MR, and (iii) VCR controls to control a presentation of content provided by the MS and rendered by the MR; in response to a media content delivery request, determining a network context of the UE and a network connectivity of the MS and MR; invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between an MS and an MR if one of the MS and MR are not in communication with the UE via a local wireless net-

6

work; and once media content delivery is negotiated, controlling a presentation of delivery via the VCR controls on the UE.

Other aspects include one or more of the following features. The CPP logic is invoked to negotiate media content delivery between an MS and an MR if the MS and MR are both in communication with the UE via a local wireless network. The local wireless network is a Wi-Fi network, a WiMax network, or a Bluetooth network. The CP logic is invoked to negotiate media content delivery between an MS and an MR if neither the MS nor the MR are in communication the UE via the local wireless network. The UE may be implemented on a handset, and the handset may include a display that is used as the media rendering device. At least one of the MS and the MR is on a 3G network and in communication with the serving node. The UE is in communication with the MR or with both the MS and the MR via a local wireless network. The CP logic negotiates service delivery from the MS, the MS being on a 3G network, the CPP logic in the UE negotiates delivery on the MR, and the CP logic and CPP logic execute synchronization logic to complete the negotiation of delivery from the MS to the MR. The UE communicates its network context to the serving node and the serving node informs the UE of the serving node's capabilities for negotiation with devices local to the UE. At least one CP logic is configured to serve multiple unrelated devices running CPP logic; these devices can be handsets and remote control units. The principal CPP can depend on the location of the user; for example, the user may use the CPP logic in the handset when the user is remote from the MR and use the CPP logic in a remote control unit when the user is local to the MR. If one of the MS and MR are remote from the UE, the CPP logic provides information about invoked VCR controls to the CP logic on the serving node to allow the CP logic to control the remote MS or MR. The MS and the MR may both be a part of a digital home network. The UE may discover local devices that can act as an MS or an MR by using Universal Plug and Play (UPnP) protocols. The MS and/or MR may announce their presence to the UE using at least one of UPnP protocols, Jini technology, RFID, and Bluetooth. When the CP/CPP is negotiating delivery of media content, it may negotiate of out-of-band media transfer between the MS and the MR.

BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 depicts a prior art IMS network.

FIGS. 2 and 3 are signal diagrams for a prior art IMS network.

FIG. 4 is a block diagram showing the principal elements of the described method.

FIG. 5 depicts logic for providing per user (or group) call models.

FIG. 6 depicts internal architecture of a certain embodiment of the invention.

FIG. 7 depicts logic for providing dynamic call models.

FIG. 8 is a simplified network diagram to illustrate the interaction between a UE, a CSCF and an application server.

FIG. 9 is a simplified network diagram to illustrate the interaction between a UE, a CSCF, a dynamic network topology database (or ME database) and policy database.

FIG. 10 depicts utilization of multiple access networks in a session having an AVS structure.

FIG. 11 depicts out-of-band mediation by a control point to use a potentially non-IMS service in an IMS context.

FIG. 12 depicts out-of-band mediation by a control point and a control point proxy to use a potentially non-IMS service in an IMS context.

7

FIG. **13** is a flowchart illustrating how devices and services are discovered and associated by the UE.

FIG. **14** is call flow diagram depicting the discovery of a device by a UE.

FIG. **15** is a call flow diagram depicting the discovery of a device by a UE and subsequent handoff to the device.

FIG. **16** is a call flow diagram depicting the discovery of a device by a UE and the establishment of a relay session to stream content to the device.

FIG. **17** is a call flow diagram depicting discovery of a device by a UE and subsequent streaming of trans-coded information to the device.

DETAILED DESCRIPTION

Preferred embodiments of the invention permit IMS user sessions to utilize devices that are discovered by the UE during the course of an IMS session. The embodiments provide for the discovery of available devices, and for choosing whether to add a discovered device to the IMS session. The choice can be made to depend on physical and/or technical factors, such as whether the IMS session involves the use of content that could benefit from the incorporation of the associated device into the IMS session. For example, if the user is receiving video, and a large-screen TV set is discovered, it would be beneficial for the user to view the video on the large screen of the discovered TV set rather than on the small screen of a handset. In addition, the decision to include the discovered device can be made to depend on a set of policies that involve business relationships (such as of the user to owner/operator of the available devices) and cost. The described embodiments allow the signaling channel to remain intact (i.e., it is not generally handed over to an associated device) allowing for a consistent service experience (i.e., the application logic can remain in the domain of the original service provider).

FIG. **4** depicts relevant portions of an IMS network according to preferred embodiments of the invention. The relevant portions include UE **402**, P-CSCF **404**, I-CSCF **406**, serving node **408**, HSS **422**, and call model database **416**.

The UE, P-CSCF **404**, I-CSCF **406**, and HSS are essentially conventional, though the content of HSS **422** is not, as described below. However, in certain embodiments, the UE may have unconventional agent logic, namely PA logic **424**, and search module **426**, each of which is discussed in more detail below. All of these entities communicate using known and defined protocols.

Serving node **408**, in preferred embodiments, includes S-CSCF logic **410** that is largely conventional though it includes certain modifications, discussed below. Serving node **408** also includes ME server logic **412** (more below) to store users' dynamic network topologies and other information, and provisioning logic **414** more below. (Alternatively, the ME server logic and the provisioning logic may each be a separate physical entity like an AS.) The ME server and provisioning logic essentially are co-located special purpose servers within node **408**. The serving node **408**, and particularly provisioning logic **414**, communicates with a call model database **416**. This database **416** (not the HSS as is the conventional case) is used to provide the call model information for a given user (more below).

Though not shown in FIG. **4**, serving node **408** communicates with application servers (ASs) that include service logic for various services, e.g., voice mail, push-to-talk, etc. The UEs use predefined codes within service requests to identify the service of interest and/or these services can be triggered in known specified ways via SPTs (as is the conventional case).

8

FIG. **5** depicts the logic flow for provisioning a S-CSCF with distinct call models for each user. Under preferred embodiments, the HSS provides initial filter codes (IFC) during UE registration (as is the conventional case). However, under certain embodiments of the invention, this IFC is programmed in an unusual way. All the service point triggers (SPTs) for each service are mapped to provisioning logic **414** (i.e., not to ASs corresponding to the actual service codes as is the conventional case).

The logic flow starts in **500** and proceeds to **502** in which the first service request is received after registration. Because of the default IFC, this service request will not trigger an AS corresponding to that service, and instead will trigger activation **504** of the provisioning logic **414**. The provisioning logic **414** will then access **506** the call model database **416**. One of the input parameters will identify the user. The call model database **416** will retrieve a call model for that particular user. This call model will include the AS identifiers for the various services for that user. The database **416** will provide **508** the call model information to the provisioning logic **414** which in turn will provide it to the S-CSCF logic **410** within serving node **408**. The S-CSCF **410** will construct a new set of filter codes, i.e., NFC, and thus a new call model, for that user (and will trigger the service requested initially using the NFC). The NFC will have SPTs identifying the corresponding ASs. This approach allows for dynamic construction of the NFCs (e.g., post registration) and allows the call model (e.g., NFC with associated SPTs) to be constructed uniquely for each user.

The above logic allows each user to have a call model and NFC that can differ from all other call models served by that S-CSCF. This functionality may be used in many ways. Per-user differentiated call models is useful though not strictly necessary to practice preferred embodiments of the invention.

This form of per user call model customization, in which different users may invoke different service logic functionality for the same given service request, is not provided in a conventional IMS network. In conventional IMS arrangements, the HSS provides static call models at UE registration. Each user gets the same ASs within their IFC and thus the same service experience (for services they are authorized to use). Moreover, the above approach allows for full portability of call models. No matter where a UE exists in the IMS network, that UE's call model may be constructed and used for that UE's service experience.

FIG. **6** depicts serving node **408** once multiple users have registered and been provisioned with their corresponding call models **602**a . . . n. Note, the different call models can point to different ASs for a given service, and they are not merely multiple instances of the same IFC/call model. Multimedia network manager **606** receives service requests **608** from the IMS network and provides service responses **610** to the IMS network. It also routes received requests to the appropriate internal entities as shown. In certain embodiments, the ME server logic and Network Map policy manager **412** are responsible for receiving information (more below) indicating that the user's UE environment has changed with new capabilities or devices, and for building information structures and models to reflect these capabilities. In certain embodiments it also includes logic to implement specified policies on whether and how to utilize such capabilities. Provisioned Service logic **414** is responsible for interacting with external or internal databases (e.g., database **416** of FIG. **4**). Media resource manager **612** is responsible for managing other resources (e.g., transcoders) that may be involved with a given service. Multimedia service manager **604** is responsible for receiving requests from network manager **606** and for interacting with the other components to

US RE44,412 E

9

construct and build the per-user call model **602**. In simple cases this may involve creating call models with the help of the provisioning logic **414** and call model database **416**. In other cases the call model construction will be dynamic (more below) using new devices and capabilities (as well as associated policies), and in these instances the manager **604** will involve ME logic **412**, media resource manager **612** as well as handoff control application server **614**.

The term handoff as used herein denotes the transfer of a service delivery from one network and/or device to another network and/or device. The handoff does not involve the dropping of an access network connection. This meaning contrasts with the meaning of the term that often appears in the prior art (referred to in the background section above), in which handoff means the dropping of a first connection in favor of a second connection based on the relative signal strengths of the two connections.

The context of an end user may change. For example, as a user roams, his or her context may change. Alternatively, even in non-roaming situations, the user context may change as new devices and capabilities emerge or become activated.

At any given moment, the user may be in close proximity to any number of devices that are capable of acting as a UE for a certain service (application). For example, the user may be near a TV that could be used to display multimedia content. Or the user may be in close proximity to a personal computer that could be used to receive multimedia information from a network connection, provided network connectivity and authorization to use such a device in this manner could be obtained.

The described methods allow a roaming user to discover (directly or indirectly) several kinds of information and invoke several kinds of corresponding relevant policies to consider when and how to use such capabilities and devices:

1. New endpoint devices (UEs or UE devices) that could be used to receive multimedia information;
2. New network connections that terminate and emanate from the UE devices;
3. New device capabilities;
4. Policies that govern use of newly discovered devices and new network connections; and
5. Policies that are implemented by the service provider that control what devices could be used for which type of services under what sort of conditions.

Policies may reside either in the UE or in a designated server in the network. In a preferred embodiment, the policies reside in the network.

An increasing number of mobile handsets support short-range wireless technologies such as Bluetooth and Wi-Fi. According to certain embodiments, a "dynamic profile" is constructed, in part, by logic that executes in the handset. This logic may be executed continuously, periodically at some network determined time interval, or on demand when the user requests a particular service. When executed, the logic senses (or otherwise discovers) the presence of associated devices in the immediate vicinity of the handset using a short-range wireless technology such as Wi-Fi.

Home and personal networking systems increasingly feature the ability to discover new devices using so-called discovery protocols. One such example is the Universal Plug and Play (UPnP) protocol that allows the dynamic discovery of devices. According to certain embodiments, dynamic device discovery and service discovery framework within a user's personal or home area network is performed. For example, UPnP may be used to create a dynamic profile of the immediate environment of the handset (i.e., user) service environment. The dynamic device discovery mechanism is used to

10

help create a personalized user area network map, which will serve as input to the switching/delivery logic.

Associated devices may announce their presence by a variety of means such as but not limited to Universal Plug and Play Devices (UPnP), Jini discoverable devices, RFID devices, and Bluetooth enabled devices.

Any method of broadcasting the capability of devices can be used. The sensing logic in the handset receives such broadcast information and assembles it to construct a dynamic profile of the user's immediate context. Since this context changes as the user roams, the dynamic profile changes to reflect the current vicinity of the handset. The dynamic profile is communicated to the serving node **408**. For example, this information may be communicated as parameters (e.g., by overloading information elements [IEs] of Session Description Protocol (SDP) messages) in conjunction with a special service request dedicated to communicating potential UE devices.

A personal agent (PA) having PA logic **424** executes in UE (handset) **402** and includes the sensing logic to discover such other potential UEs or associated devices (more below). The dynamic profile of the user's immediate environment is communicated to the ME logic **412**. This is done by having the ME server invoked in response to the special service request from the UE for communicating such discovered devices and capabilities. The ME service will construct topologies and maps to identify the potential UEs, other networks, etc., to reflect the new devices and capabilities discovered or sensed in the UE's vicinity that could potentially be used by a given user.

In certain embodiments, the handset's User Agent info (UAProf) or Composite Capabilities/Preference Profiles (CC/PP) representing device capabilities and user preferences is used to personalize the multimedia service delivery framework. Serving node **408** will gather the UAProf or CC/PP from the endpoint devices to guide control of not only the rendering and trans-coding of content to be delivered to that device, but also the generation of the call agent as well as the decision to execute that service agent within the network or at the endpoint.

The personal agent supports an automated network and service discovery mechanism, such as the industry standard Universal Plug and Play (UpnP) framework, to establish association with and control of those networked devices. The networked devices that the PA can be associated with through the discovery procedure can be connected to the mobile handset via wireless connectivity, such as Bluetooth, Jini, self-identifying label technologies such as RFID, or Wi-Fi, or via wired connectivity, such as USB or IEEE 1394 links.

In certain embodiments, the static user profile downloaded by the HSS into the S-CSCF at registration time is provisioned by the network operator to contain the address of the ME server. Thus, every communication of the dynamic profile originating from the UE and received by the S-CSCF causes a SPT trigger to fire, and control is transferred to the corresponding ME server. In this fashion the serving node **408** and more particularly the ME server **412** becomes aware of the immediate context of the UE (handset).

Once the ME server has the information in the dynamic profile, it consults a database of policies described by the service operator. These policy descriptions may be co-located with the ME logic and even the S-CSCF logic (see, e.g., FIG. **6**). These policies prescribe certain actions that depend on the data contained in the dynamic profile. For example, a policy can require that if the UE sensing logic discovers a Wi-Fi connection in its immediate vicinity, then this discovered network should be used for originating session requests. Spe-

US RE44,412 E

**11**

cific logic associated with this policy is then executed to send directions to the PA to enforce this directive at the UE level. When evoked, the policy decision only changes the behavior of those UEs that come under the control of a particular Mobile Virtual Network Operator (MVNO) (A MVNO is an operator that use the radio spectrum license-holder's underlying network facilities to offer services to the consumer. MVNOs do not typically own network infrastructure or spectrum license). Another MVNO may, in general, have a completely different set of policies. Policies may not only be specified by the MVNO but also by end users, provided the network interfaces allow the users to specify actions that should be taken when certain events and situations are discovered in the UE's environment. Such user specified policies may over-ride policies specified by the MVNO.

FIG. 7 is a flow diagram illustrating the customization of service logic. The logic starts in step **700** and proceeds to step **702** in which the PA logic **424** on the UE discovers or senses its immediate environment or context and constructs a message specifying this dynamic context. This message may include information about, new devices that could be used to receive multimedia information, new network connections that terminate and emanate from such devices, and new device capabilities. The PA on the UE sends the message to S-CSCF (**704**) and the message either causes an SPT trigger or it does not, depending on how the IFC or NFC is constructed (**706**). If the message is triggering event, the logic proceeds to step **708** in which control is transferred to the ME server; otherwise the logic terminates (**799**). The ME server updates its internal database to reflect the information communicated in the message from the PA in the UE (**710**). The ME server then applies any relevant policies that will determine, for example, whether and how to utilize newly discovered devices and capabilities (**712**), and the logic determines whether any action is specified by the policy (**714**). If so, the specified action is initiated (**716**). This can be done by customizing the PA logic **424** on the UE or by customizing the AS logic. For example, in a typical embodiment, S-CSCF logic **410** will be modified to initiate or trigger the specified actions after the ME logic has updated its models accordingly and perhaps after a new dynamic call model is instructed for that particular user to reflect new devices and capabilities.

In an alternative embodiment S-CSCF logic **410** is not hosted within a serving node **408** as shown in FIG. **4**; that is, the S-CSCF **410** is not constrained to be hosted by the MVNO domain. In this embodiment the S-CSCF remains hosted in the IMS serving domain of the network operator and is a separate entity, as in a conventional IMS network, and the ME server and provisioning logic are configured as ASs, though, as explained above, they do not provide conventional IMS services and instead are used in the construction of dynamic call models.

The interactions between the CSCF and an AS are summarized in FIG. **8**. As outlined above, in IMS networks, all services are provided by application servers (ASs). In FIG. **8**, the network is simplified (for descriptive purposes) to show only one AS **802**, but in practice there will be multiple ASs. Service requests are sent (directly or indirectly) from a UE **402** (see also FIG. **4**) to a S-CSCF **410** (see also FIG. **4**). The S-CSCF uses its internal call model (see, e.g., **602** of FIG. **6**) to invoke a corresponding application server.

In preferred embodiments, the call-model **602** (FIG. **6**) (i.e., state machine) executing in the S-CSCF **410** for this UE is modified to take into consideration the newly discovered devices and network connections as described herein. This newly discovered information is stored in the ME server **412**. The discovery is done by sensing logic resident in the UE and

**12**

may be communicated to the ME server periodically, or when discovered, or at pre-designated intervals. As discussed above, this communication may be done, for example, by overloading the information elements of the SDP. The interaction between the ME server **412** and the CSCF **410** is shown in FIG. **9**. As described above, the CSCF **410** is invoked with messages (or overloaded messages) that include information about discovered devices, network connections, new capabilities, etc. The CSCF **410** then invokes the ME server **412** which in turn consults the policy database **902**.

In one scenario, a subscriber wanting to view multimedia content from an Internet server on his handset initiates an IMS request to serving node **408**. The request emanates from the UE to the P-CSCF and onwards to the S-CSCF as explained above in connection with FIG. **1**. From the S-CSCF it is routed to the ME (acting as an Application server) so as to perform per subscriber customization, as explained in connection with FIG. **4**. This request then causes a connection to be made to the serving node **408** (explained in more detail later) and an IMS session is established between serving node **408** and the UE using the access network to which the P-CSCF is attached. This IMS session is uniquely identified by an IMS Charging ID (ICID) assigned by the P-CSCF.

As shown in FIG. **10**, PPP (Point to Point Protocol) session **1002** has its own unique identifier called the Transport Charging ID (TCID) **1006** assigned by the device (Packet data Gateway or Packet Control Function in the BSC) from which the PPP session emanates. TCID **1006** and ICID **1008** together uniquely identify the multimedia session in which the SIP/IMS signaling is embedded within the IP/PPP connection.

The ME function **412** creates or modifies a computational entity called an AVS (Audio Video Session) **1004** to model and control (in part) the actual access network connections for a given user. The call model **602**a, discussed previously, is constructed first, based on the resources and policies. The AVS, on the other hand, represents what is actually going on, or intended to take place, or actually takes place (i.e. dynamically modifying to context). That is, the AVS represents the actual connections registered or to be registered in response to a given service request. If each access network connection is considered to be a "session", then the AVS is a form of meta-session, or a super-session incorporating the access network sessions. Each AVS is uniquely identified by a AVID (Audio Video session ID) that is a function of the underlying TCID and the ICID.

An AVS is a representation of every access network that the UE encounters while roaming. For each new access network this representation creates a new "leg" (called Incoming Call Leg-ICL **1012**, **1014**). Each ICL has associated with it a TCID and an ICID (generated by other network elements) that together uniquely identify the session corresponding to that access network. Since the AVS **1004** has access to registration information of the UE, it knows that various ICLs (and hence various TCID+ICID combinations) really belong to the same UE, and hence, for each UE, the AVS representation captures all the access networks that the handset encounters. And since some access networks may support circuit-switched (CS) transport mode whereas others may support packet-switched (PS) transport modes, ICLs may be CS or PS supporting ICLs.

Network policies (see FIG. **9**) will generally govern the co-existence of ICLs within a single AVS. For example, current telecomm networks do not support the idea of a UE being associated with more than one circuit-switched network. This translates into an AVS constraint: "only one ICL may exist for CS sessions." Another example of a constraint is provided by

US RE44,412 E

**13**

current so-called Class B handsets in which both a CS and PS protocol stack are available but only one such stack can execute at any time. Yet another example is provided by Class B+Wi-Fi handsets in which a CS session and a Wi-Fi session, or a Wi-Fi and a PS session can coexist. In a Class A handset that supports CS, PS and Wi-Fi contemporaneously, all three sessions can be active together. Such constraints, emanating from the network or the handset, translate into constraints on the type and number of ICLs can be supported by an AVS. The policies can be contained in the policy database, and as with the construction of call models, the policies may be accessed when modifying AVSs.

In one example, a class B UE is engaged in a PS session watching Mobile TV. The UE roams into a Wi-Fi zone and a handoff happens, after which the MobileTV feed uses the Wi-Fi network. The previous PS session is idle and could be cleared. However, keeping it around serves a useful purpose. For example, suppose a voice call arrives for this UE. Since the CS stack is not executing in the UE, the call will normally be routed to voice mail without the user being informed of the call. But suppose a serving node **408** is informed of the arrival of this call (as explained below), and then uses the PS session to present a dialog box giving the user a choice to take the voice call. This example shows the usefulness of having more than one session (more than one ICL) active. Policies governing a given service will dictate whether or not to keep a leg active. Moreover, sometimes a leg may be unavoidably dropped, for example via lack of sufficient use, or because of signal issues.

As stated above, the serving node **408** includes one AVS per user. As shown in FIG. **10**, an AVS **1004** can include multiple ICLs **1012**, **1014** and an OCL or OGL **1010** (outgoing call leg). The AVS also includes a control point **1016**. As explained below, the control point (CP) may be used to provide mediation between some form of service or server and the UE. Not shown in FIG. **10** is that each leg may have effectuation routines to perform or effectuate routine functions on a given access network, such as responding to "are you alive" messages. When the serving node **408** (e.g., via the ME logic) manipulates the AVS it corresponds to actions in the "real world." For example, adding an ICL means getting registered on that access network.

FIG. **11** illustrates how certain components, particularly the CP **1016** interact with other entities. It also shows how to incorporate non-IMS (legacy) services into a network, or to "marry" multiple networks. As explained below, the CP **1016** within AVS **1004**, can perform out of band mediation so that a media server (MS) **1104** somewhere in the network can deliver content to a media renderer (MR) program **1106** on the UE, which receives and presents such content.

CP **1016** is connected to the MS **1102**, which in turn establishes a connection to the serving node **408** (using network server specific protocols). The connection between the CP and the MS is internal to the ME **412**. The connection between the MS and the serving node **408** is an Outgoing Leg **1010** of the AVS. That is, AVS **1004** models this connection as outgoing leg component **1010**. CP **1016** is also connected to MR **1104**, which preferable may reside in the UE. The connection between the CP and the MR is an Incoming Leg, e.g., **1012**. That is, AVS **1004** models this connection as incoming leg component **1012** or **1014**. Thus, in a session having multiple MRs there are multiple Incoming Legs for a single AVS, as shown in FIG. **10**.

Continuing with the example above, the CP negotiates multimedia content delivery with the MS and instructs the MS to deliver content to an address corresponding to the MR on the UE. The instructions provided during such mediation

**14**

will conform to the environment, context, and capabilities of the UE. CP **1016** also negotiates media rendering with the MR itself in each Incoming Leg of the AVS. That is, the CP effectively instructs the MR to start expecting content from the MS, and to present such. Again, the instructions provided during such mediation will conform to the environment, context, and capabilities of the UE.

When an access network connection is discovered by the UE sensing logic and communicated to ME server **412**, and if the policy database **902** (FIG. **9**) permits its use, the newly discovered access network connection is modeled and included into the current AVS as an Incoming Leg. Each access network available to a UE corresponds to an Incoming Leg of an AVS and the connection between the CP and MS corresponds to the Outgoing Leg of the AVS.

Thus, if the UE has sensed three different access networks and policy allows all three, then there are three distinct access network connections between the UE and the S-CSCF. In such a situation, there are signaling and bearer channels in each access network that can be utilized. It is a matter of policy that decides which signaling channel within an access network is to be used and which channels within an access network is to be used for bearer traffic. In the case when coverage of an access network is lost (for example, due to roaming of the UE), the corresponding access network connection and the associated AVS Incoming Leg is "cleared" under S-CSCF serving logic control by the P-CSCF.

As mentioned above, many new kinds of access networks, such as Wi-Fi and WiMax, are being deployed. The proposed IMS specifications allow the UE to connect to an access network. Preferred embodiments of the present invention allow the UE to remain in simultaneous connection (or potential use) with multiple access networks and the choice of which access network to deliver a particular service to the UE is to be made by policies resident in the ME function in the serving node of the network. That is, the AVS facilitates control of multiple access networks (both signaling and bearer) and allows choices to be made (by the system and perhaps the user) as to which network to use in a given context and time.

In conjunction with deployments of various kinds of access networks, handset manufacturers are also producing handsets that support multiple radio access technologies. Examples of such handsets today are those that support Wi-Fi and GSM/CDMA cellular networks. In such handsets, known as Class A handsets, both the circuit-switched session of the GSM/CDMA network and the packet-switched session of Wi-Fi can co-exist and be active simultaneously. Moreover, there are numerous proposals for voice call handoffs between cellular (GSM/CDMA) and Wi-Fi networks.

Using the described embodiments, a Class A handset can have multiple packet sessions and a circuit-switched session simultaneously active in the handset. In the terminology explained above, the corresponding AVS may have multiple Incoming Legs corresponding to one circuit-switched and multiple packet-switched sessions. Another type of handset, called a Class B, handset only supports either a circuit-switched session or a packet session at any given time. If the handset roams into a Wi-Fi area from a cellular area, the circuit-switched session is replaced by a new packet-switched session supported by the new Wi-Fi network in a Class B handset; in a Class A handset the circuit-switched session can be allowed to persist. This corresponds to removing one Incoming Leg of the AVS (representing the circuit-switched cellular connection) and adding another Incoming Leg (representing the Wi-Fi connection) to the underlying AVS for Class B handsets. In the case of Class A handsets in

US RE44,412 E

**15**

which the circuit-switched session is not cleared, the situation corresponds to simply adding another Incoming Leg to the AVS session.

The following scenarios for Class A and B handsets are possible:

1. Two subscribers A and B are in a voice call. The AVS corresponding to this call for A's UE may have an Incoming Leg (circuit-switched) for A. The AVS for B's UE has an incoming leg ("packet-switched") for B. Thus, A is engaged in a circuit-switched call and 'B' is engaged in a packet-switched call; the two parties in the call are using different access technologies. This example extends to multiparty calls.

2. Two subscribers A and B are in a voice call. Both users are assumed to be using packet-switched sessions (i.e., packet-switched [PS] modulation over the cellular spectrum). Under roaming conditions, at some point in this call, assume that both roam into new access networks that offer the resources (e.g., bandwidth) to support a video telephony sessions between A and B. These new access networks will correspond to new Incoming Legs added to the AVSs, along with new media renderers, and the policy in ME will dictate the use of the new access networks to support the video call. The new media renderers for the video telephony will be OCLs for each of the AVSs—i.e., AVS for A and an AVS for B.

3. Two subscribers A and B are in a voice call. Assume that A is in a circuit-switched session and that B is in a packet-switched session. Now assume that A roams into a new access network such as Wi-Fi that supports video telephony. This new access network corresponds to a new Incoming Leg of the underlying AVS for A. The AVS under policy control may now be, as in use case number **2** above, converted into a video telephony session. An OCL may be added to correspond to a new OCL for the MR for the delivery of video telephony.

4. Two subscribers A and B are in a circuit-switched voice call. A now wishes to send a multimedia message including images to 'B.' Assume that both A and B had previously roamed into new access networks that correspond to packet-switched sessions (Incoming Legs) in the underlying AVS for each. These packet-switched sessions can be used to deliver the multimedia object from A to B.

Scenarios 1-4 show that by having access to multiple access networks under mobility situations, the described embodiments allow services that use a combination of packet and circuit-switched access network technologies.

As explained above, mechanisms to utilize non-IMS, legacy services within an IMS context are provided. To do this, the system logically separates the control and bearer parts of the legacy service. The control component of the service is handled by IMS, and the bearer component may remain independent of IMS. The control point (CP) **1016**, referred to earlier, is the mechanism used to allow "out of band" media transport under control of IMS. Under preferred embodiments every AVS **1004** has an associated CP **1016**, for example, logically within the AVS. More specifically, each AVS is designated to have an "Outgoing Leg" (OCL) **1010** that contains a CP. The CP has capability to transact with an Application Server (AS) using a standard protocol, such as RTSP, and it has the capability to transact with programs in the UE called Media Renders (MRs), again using standard protocols such as SIP, or SOAP/HTTP. The CP itself may be considered an Application Server (AS) by the S-CSCF (i.e., interacted with as if it were an AS).

**16**

Now consider a UE requesting Mobile TV service. This request emanates from the UE (on an ICL) and is forwarded by the S-CSCF to the CP **1016** acting as an AS (in standard IMS fashion). Since the CP acting as an AS has access to IMS charging and authentication mechanisms, the first objective of re-using IMS infrastructure for legacy services is fulfilled. Once the charging and various other bookkeeping functions have been finished, the CP contacts the MobileTV server (e.g., illustrated as Content Server **1018** in FIG. **10**) using RTSP protocol. Alternatively, the CP could pass control to another Application Server that now contacts the MobileTV server using RTSP'', i.e., there is a chain of Application Servers as in standard IMS. (Chaining of application servers is a known technique). The CP instructs the MobileTV server to initiate sending media to the UE (at a designed IP address) and instructs the MR in the UE to render the incoming media. (See FIG. **11**.) This media transfer from the MS to the MR may use an out-of-band (non IMS) transport such as RTP/UDP/IP. In some situations, other approaches to deliver media will be needed. For example, the MobileTV server may not support the capability of receiving a service request from client A and initiating service to a client at a different address. In this case the MobileTV server will be asked to send the media to the CP's address and it will be forwarded to the UE by the CP, a process called re-NATting).

The communication between the CP and the UE for setting up media rendering and for other functions uses valuable spectrum. In order to reduce such spectrum-consuming communications, the relationship between an MR and a media server can be fixed a priori and pre-provisioned. Thus the CP always picks a pre-designated MR for a particular media server.

In a preferred embodiment, wireless spectrum-consuming communications between the CP, media servers and media renderers are reduced by introducing a CP Proxy (CPP) that resides in the UE. This architecture is illustrated in FIG. **12**.

As indicated above, UPnP architecture includes three functional entities: control point (CP), media server (MS), and media renderer (MR). These may be implemented in different physical devices. In a digital home environment, for example, the MS and MR typically reside in a TV set and the CP in a remote control unit.

It is assumed that the MS and MR entities represent abstractions that capture the essence of media servers and media renderers. The abstractions allow programmers to write general-purpose software that deals with the properties of these entities without having to deal with their inner workings. The handling of these inner workings is left to the implementation of the media server and the media renderer themselves. Thus, by way of example, if a program desires to issue a "suspend" command to an MS, it may use the MS's defined interface to issue that command. It is left to the MS to implement the "suspend" command.

Communications between the CP and an MS and MR use the SOAP/HTTP protocols. Direct communication between an MS and an MR is referred to as "out of band," since is up to the MS and MR to select the protocol. One such protocol is RTSP/RTP.

In one example, the MS implements a video player, the MR implements an LCD display, and the CP implements a remote control unit. The CP queries the MS for a contents directory and presents that on the display unit, allowing content to be selected for rendering. The commands between the CP and MS, and between the CP and MR use SOAP/HTTP. The communication between MS and MR could use RTSP/RTP.

In a wireless network in which the CP implements a handset, and the MS and MR implement a non-mobile media

17

server and media renderer, the wireless network could be used to carry a control protocol between the these three entities, akin to SOAP/HTTP (but perhaps a more secure version). However, this approach suffers from the disadvantage that the control messages between the CP and the MS, and the CP and the MR use the limited capacity of the wireless network.

In certain embodiments, the UPnP architecture is extended into a wide area network environment. One approach, illustrated in FIG. **12**, reduces control message traffic over the wireless network by moving CP **1016** into a network element and running one or more CPPs **1202** in one or more handset (s). This architecture has two advantages. First, the communication between CP **1016** and MS **1102** need no longer use the wireless network. Second, when CPP **1202** is in close proximity to MR **1104**, the handset (CPP) can use an available Personal Area Network (PAN), such as Wi-Fi, to communicate with the MR. Since the wide area wireless network uses expensive spectrum, these advantages can afford considerable cost savings.

In this architecture, the CP and the CPPs need a synchronization protocol. Communication between the CP and the CPP could be optimized by using off-peak times to communicate and by making the CPP as independent of the CP as possible.

Moving the control point into the wide area network enables a user to connect to services provided by MSs that are not located in the home, such as foreign television stations. In addition, MSs, whether in the home or not, can now be rendered on MRs outside the home, such as on the handset itself, or on an MR that is in proximity to the handset running the CPP when the handset is outside the home, as described above.

CP **1016** running in the SN can support multiple CPPs. For example, there can be a CPP implemented in a handset, and also in a remote control unit. When the user is inside the home, he may prefer to use the remote control unit as the CPP since it may have a better form factor for VCR-type controls. On the other hand, when the user is outside the home, he invokes the CPP on the handset in order to maintain connection and control with the home network.

The above techniques are illustrated by the following communication sequence. A subscriber requests a media service to be rendered on a home Wi-Fi-enabled display device. CPP **1202** communicates with CP **1016** via internal interface **1204** using the wide area wireless network. Subsequent communication between CP **1016** and MS **1102**, or between CPP **1202** and MR **1104** need not use the wireless network. Upon receiving confirmation from CP **1016**, CPP **1202** instructs MR **1104** to negotiate an out-of-band service request with MS **1102**.

In the case where the UE is in the proximity of both the desired MS and the desired MR and can communicate with them via a PAN, such as Wi-Fi, the CPP in the UE negotiates the association between the MS and MR. In this case there is no need to involve the CP in the SN, since this would involve unnecessary use of wireless bandwidth. Conversely, when the UE is not in the proximity of either the desired MS or the desired MR, the CP handles the negotiation and association of both the MR and MS, using fixed communication links instead of wireless links.

Thus, in a wide area networking extension of UPnP, moving the CP into a network element, such as the serving node of an IMS session, and placing the CPP into the handset optimizes usage of the wireless spectrum usage.

This architecture also allows normal telephony to be integrated with UPnP-based media services. As used herein, normal telephony includes supplementary features such as call diversion, three-way calling, and voicemail.

18

In an alternative architecture, the CP does not migrate to the core network, but continues to reside in the handset. In this peer-to-peer style architecture, there is no core network element, but the peer-to-peer signaling uses the valuable and limited resources of the wireless spectrum. The network-based architecture, as indicated above, consumes less wireless spectrum.

CPP **1202** has local service logic that decides what MR to pick for a particular media server. In other words, the CP-MR negotiation is transformed into CPP-MR negotiation (which is local to a UE and hence does not use spectrum). Moreover, the CPP policies and logic can be updated periodically from the network-resident CP at opportune times.

In yet another embodiment, the concept of MVNO-customized logic may be applied to so-called hybrid networks. In general a hybrid network is a combination of two or more individual networks. Examples of digital broadcast networks for joint use are DVB-H (Digital Video Broadcast—Handheld), and Media FLO (Forward Link Only). In a hybrid network, the broadcast network provides a high capacity but one-way transport for multimedia (video) traffic, while the UMTS (Universal Mobile Telecommunications System) network (or other network) may provide lower capacity two-way transport for interactive services. In such hybrid networks, the UMTS network is used for control and signaling purposes for the services offered by the broadcast component network. In this fashion, the UMTS network supplements the digital broadcast network by providing a control network or a network for user interactivity functions. Conversely, the broadcast network may supplement a UMTS (or other) network by providing certain broadcast functionality.

Since the PA runs in mobile handset environment, the handset has a direct logical service interface to the Internet Wide Area Network (WAN) via the 2G/3G wireless network. From the UPnP device architecture perspective, the PA serves as an Internet Gateway Device (IGD). An IGD is an "edge" interconnect device between a residential Local Area Network (LAN) and the Wide Area Network (WAN), providing connectivity to the Internet. The IGD typically runs in the local network environment, e.g., on a PC in the WLAN environment.

In the search process described below, the discovery, registration, and use of an associated device corresponds to the setting up of a new incoming leg of the AVS session. The ME server then determines whether there is an advantage to be gained from switching the media rendering from the renderer in the handset to a renderer in a discovered device. The CPP can then offer a choice to the user as to whether to switch to the new renderer, or the switch can be performed automatically.

A UPnP service manager (SM) is provided in the PA to organize the services discovered, as shown in FIG. **13**. The UPnP service manager performs device/service search and also listens to advertisements being sent out by new devices. FIG. **13** illustrates exemplary logic for the service manager. The service manager logic starts (**1302**) when the PA detects the presence of a PAN. The service manager consults a directory of services that are potentially available on the PAN (**1304**). If the UE is seeking to use a service, and it finds the service present in the directory, the service manager joins the PAN (**1306**) and broadcasts a search message (**1308**). When the PA receives responses from the services on the PAN, it determines whether the user is authorized to use the desired service, and whether the service is still available (**1310**). If the answer is yes, the process for associating the PA with the new service takes place (**1312, 1314, 1316, 1318, and 1320**). If the UE is seeking to provide a service in the PAN, and the service

US RE44,412 E

**19**

is not already present in the PAN (**1304**), the service manager joins the network (**1322**) and broadcasts an advertising message (**1324**). In response, it may receive messages from the devices on the PAN (**1326**), and then proceed to associate itself with PAN (**1314**, **1316**, **1318**, and **1320**).

Two functions enable the discovery process: search module **426** (see FIG. **4**) running in PA logic **424**, and the advertisement module, running in a device to be added to the network.

### Search Module

Search module **426** is a UDP-based function in the PA that broadcasts search messages whenever the user wants to search for new devices. It communicates with the user interface of the service manager and updates a list (in the PA logic **424**) of discovered devices on the service manager when it finds a new device. It determines whether or not the device is new by matching its Universally Unique Identifier (UUID) against those of the devices already discovered. Each device has a unique UUID.

Search Module **426** consists of the following procedures:

Discovery: The discovery protocol allows control point proxies, such as the PA, to search for devices of interest in the network. A search is carried out by multicasting a search message with a pattern equal to a type or identifier for a device or service. Responses from service providers/devices contain discovery messages that are essentially identical to those advertised by newly connected devices. In other words, the responses to the outgoing discovery messages from the PA are similar to the messages the service providers/devices are themselves unicasting as their own advertising messages, as described below. The former are unicast while the latter are multicast. Below is a format of a Search message:

M-SEARCH*HTTP/1.1
HOST: 239.255.255.250:1900
MAN: ssdp: discover
MX: seconds to delay response
ST: search target

Response: In a response, the discovered device sends a message to the M-SEARCH source IP address and port that sent the discovery request to the multicast channel. This response follows the same pattern as listed for NOTIFY with "ssdp: alive" (see below in the description of the advertising module) except that a search target (ST) header is used instead of the new target (NT) header. The format is as follows:

HTTP/1.1 200 OK
CACHE-CONTROL: max-age=seconds until advertisement expires
DATE: when response was generated
EXT:
LOCATION: URL for UPnP description for root device
SERVER: OS/version, UPnP/1.0, product/version
ST: search target
USN: advertisement UUI

Description: After the PA has discovered a device, the PA still knows very little about the device. In order to learn more about the device and its capabilities, or to interact with the device, the PA retrieves the device's description from the URL provided by the device in the discovery message. The PA sends the following request header to the discovered device:

GET path to description HTTP/1.1
HOST: host for description: port for description
ACCEPT-LANGUAGE: language preferred by control point.

**20**

By default the 'Host' and 'Accept' header fields in the request headers are sent, following normal conventions, such as from HTML. Once the socket is created, where the Host-Name and RemotePort properties are set to the values specified in the URL, the request header block is then sent to the discovered device, which consists of the command (GET) and the other header fields defined above. A sample of a device description in the XML format is shown:

```
<serviceList>
<service>
<serviceType>Telephony</serviceType>
<SCPDURL>URL to service description</SCPDURL>
<controlURL>URL for control</controlURL>
<eventSubURL>URL for eventing</eventSubURL>
</service>
</serviceList>
```

### Advertisement Module

When a device is added to the network, it advertises its services to control points by multicasting discovery messages to a standard address and port at regular time intervals. Serving as an UPnP control point, the PA listens to this port to detect when new capabilities are available on the network. Each advertisement message contains information specific to the embedded device or service as well as information about its enclosing device. Messages should include the duration until the advertisements expire. If the device becomes unavailable, the device will either explicitly cancel its advertisements, or wait for the advertisements to expire on their own.

The advertisement module in the PA listens for advertisement messages. It is also a UDP-based application that listens on port **1900** (as given in the UPnP specifications). It communicates with the user interface of the service manager and updates the list of discovered devices on the service manager when it finds a new device. It determines whether or not the device is new by matching its UUID against those of the devices already discovered.

The service manager is needed because more than one service may be present in the Personal Area Network (PAN) and the manager provides an easy and intuitive way for the user to manage all the discovered services/devices. In addition, the service manager is responsible for communicating the updated PAN neighborhood configuration (i.e., context) of the mobile handset to serving node **408**. The discovered device and service will be reported to the serving node **408** in a SIP message which includes an SDP extension header. The service manager enables the mobile handset user to accomplish this.

When a new device is added to the list in the service manager a timer is started whose value depends on the cache-expiry value sent by the device. Once this timer expires, the device/service is removed from the list. However, if an advertisement message is received from that device the timer is restarted.

The format of the multicast message is as follows: values in italics are placeholders for actual values.

NOTIFY * HTTP/1.1
HOST: 239.255.255.250:1900
CACHE-CONTROL: max-age=seconds until advertisement expires
LOCATION: URL for UPnP description for root device
NT: search target

US RE44,412 E

NTS: ssdp: alive
SERVER: OS/version, UPnP/1.0, product/version
USN: advertisement UUID

### UPnP Device Discovery

The following case illustrates by way of example a session that involves the PA client discovering an associated device via UPnP Discovery mechanisms. In this example, the new device to be associated with the PA client is powered on and starts advertising its service and device descriptions. For example, the new device might be a PC with IGD software, whose display will be used as a media renderer.

As depicted by **1401**a, **1401**b, and **1402** in FIG. **14**, when a device is added to the network, the device is allowed to advertise its presence on the network using Simple Service Discovery Protocol (SSDP). The UPnP discovery procedure operates transparently on top of various wireless or wired PANs or Home Area Networks (HANs), such as Bluetooth, Wi-Fi, USB, etc. When a control point such as the PA IMS/SIP mobile client is added, the control point is similarly allowed to generate a multicast search for devices. In either case, the message exchange consists of a brief description of the device that includes the UPnP device type, the device ID, and a URL to the full device description. The message formats are as described above.

Next, as depicted by steps **1403-1406** in FIG. **14**, the UE obtains more information about a specific device by retrieving the full description from the URL with HTTP GET. The full description is composed of a device description and a service description. The device and service descriptions are XML documents and are constructed by the device vendor with the aid of the device and service template schemas. The service description contains details of the hosted API commands, which are called actions, along with parameters, which are called arguments.

As shown by **1407** in FIG. **14**, once the device and service descriptions of a particular media device in the PAN/HAN have been retrieved, the PA IMS/SIP mobile client has established an association with that device, completing the UPnP device discovery process.

### Associated Device Discovery and Handoff Session Via UPnP

The following case illustrates a session that involves the PA client discovering an associated device via UPnP Discovery mechanisms, and the serving node triggering a handoff procedure from the PA client to the associated device to initiate a real time streaming protocol (RTSP) streaming session. In this example, an IMS/SIP session has been established between the PA and the Media Server Control AS in the serving node.

As depicted by **1501-1507** in FIG. **15**, the discovery and association of the new device proceeds as described above. Next, as shown by **1508**a, **1508**b, and **1508**c, the PA IMS/SIP mobile client, located in the user's home network, includes the newly associated device information in the SIP RE-INVITE message it sends to Handoff Control Application Server (AS) module **614** (within serving node **408**). In this message, the mobile station (MS) or UE includes its original SIP user identifier into the from-field of the SIP header. It also includes its new IP address into both the Contact field of the SIP header, in order to inform the corresponding host where it wants to receive future SIP messages, and also into the c

(Connection) field of the SDP header that contains a description of the session, in order to redirect the data traffic flow towards its new location.

As depicted by **1509** in FIG. **15**, the information about the newly discovered device is added to the ME framework database entry associated with the mobile device. In addition, as depicted by **10** in FIG. **15**, the new device discovery/association event may trigger a handoff control decision to be executed in the Handoff Control Application Server module **614**. This decision is driven by policy logic in policy database **902** (see FIG. **9**). The policy logic includes rules that depend on technical specifications of the discovered device that determine whether the discovered device, if associated with the ongoing IMS session, would add value to the user. The policy logic may also include business-based rules that reflect the relationship of the user to the owner/operator of a discovered device.

As depicted by **1511**a, **1511**b, and **1511**c in FIG. **15**, if a handoff event is triggered, the response from the serving node towards the PA mobile client includes the handoff control information.

As depicted by **1512** and **1513** in FIG. **15**, the PA IMS/SIP mobile client issues a SOAP remote procedure call to the media renderer (i.e., the device that renders the media) to initiate a RTSP streaming session. Services (i.e., media renderer) keep state tables updated so that control points can obtain meaningful values. When state variables change, events are broadcast over the home IP network to all interested control points, which may include multiple handsets having PAs and CPPs in a home environment.

As depicted by **1514** and **1515** in FIG. **15**, the media renderer initiates the RTSP signaling transactions to establish a streaming session with the media server. As depicted by **1516** in FIG. **15**, the PA mobile client sends a SOAP remote procedure call to the media renderer to PLAY the multimedia stream.

As depicted by **1517** in FIG. **15**, the media renderer sends the RTSP Play command to the streaming media server to start the media stream. This stream is out-of-band transport of the media stream from the media server to the media renderer.

As depicted by **1518**a, **1158**b, and **1518**c in FIG. **15**, the user may optionally decide to disengage the serving node from controlling the media server and allow the media control to be handled directly from the media renderer. In this case, the PA mobile client sends a SIP RE-INVITE message towards the media server control application in the serving node to disengage.

### Associated Device Discovery and Relay Session Via UPnP

The following case illustrates a session that involves the PA client discovering an associated device via UPnP discovery mechanisms, and the serving node triggering a relay procedure to allow RTSP streaming content to be relayed from the PA client to the associated device. In this case, the media transport takes place over the 2G/3G network to the handset, and from the handset it is relayed to a discovered associated device using a WLAN/PAN.

In this example, the PA acts as a SIP UE and an IMS/SIP session has been established between the PA and the Media Server Control AS in the serving node.

As depicted by **1601** to **1609** in FIG. **16**, the steps involving discovery are as described above in connection with FIG. **15**.

As depicted by **1610** in FIG. **16**, the new device discovery/association event triggers an action to have the PA relay the content to the newly associated device.

US RE44,412 E

23

As depicted by **1611**a, **1611**b, and **1611**c in FIG. **16**, the response from the serving node towards the PA client includes the relay control information.

As depicted by **1612** and **1613** in FIG. **16**, the PA client issues a SOAP remote procedure call to the associated device, which, in this case, is a media renderer, to establish a UPnP LAN connection.

As depicted by **1614** and **1615** in FIG. **16**, the PA client, serving as an UPnP media server device initiates the RTSP signaling transactions to establish a streaming session.

As depicted by **1616** in FIG. **16**, the associated device operating as an UPnP media renderer sends a SOAP remote procedure call to the PA client to initiate the PLAY action to start the multimedia stream.

As depicted by **1617** in FIG. **16**, the PA client sends the RTSP PLAY command to the multimedia server to start the media stream.

As depicted by **1618**a, **1618**b, and **1618**c in FIG. **16**, the user may optionally decide to disengage the serving node from controlling the media server and allow the media control to be handled directly from the media renderer. In this case, the PA client sends a SIP RE-INVITE message towards the media server control application in the ASN to disengage.

Dynamic Media Resource Control

This case illustrates a session that involves the PA client discovering an associated device via UPnP Discovery mechanisms, and the serving node triggering a handoff procedure to allow RTSP streaming content to be relayed from the PA client to the associated device. In addition, the serving node also determines that the content to be delivered to the newly associated device via the PA (relay) requires trans-coding and directs a Media Resource Control Function (MRCF) to establish the trans-coding session. Transcoding can involve, for example, changing the spatial or and/or color resolution of a video stream to take advantage of higher resolution viewing capability on a discovered device.

As described in detail below, in this case the MRCF responds to the INVITE request with a 200 OK message indicating the selected media in the SDP. The MRCF will also reserve the requested local resources at that time and return the appropriate resource identifiers in the 200 response.

In one embodiment, the Media Server Control AS controls a trans-coding session and is aware of MRCF capabilities. The MRCF accepts INVITE requests sent from the AS, via the S-CSCF, to dynamically set up the trans-coding configuration. The INVITE sent to the MRCF contains sufficient information to support the RTSP session that requires trans-coding. The MRCF always grants the requests from the AS, unless it has reached its resource limits.

It is assumed that the PA is acting as a SIP UE and that an IMS/SIP session has been established between the PA and the Media Server Control AS in the serving node.

FIG. **17** illustrates the steps involved in setting up the MRCF to provide trans-coding for a mobile originated session, where the MRCF is receiving directions from the AS operating as a back-to-back user agent (B2BUA). In other words, the AS can initiate calls/sessions itself. In FIG. **17**, the number enclosed within the square brackets, i.e., the "[x]" notation, is an indicator of a particular SIP dialog.

As depicted by **1701** in FIG. **17**, the media renderer device is discovered by the PA, as described in detail above.

After the Handoff Control AS has triggered a PA relay action, an RTSP streaming session is initiated from the mobile handset (**1702-1719**). The Media Server Control AS is aware of the different codec requirements between the PA

24

client in the mobile handset and the newly associated device by retrieving the ME framework parameters reported by the PA when the newly terminal device is discovered and associated.

The Media Server Control AS serves as a B2BUA and interacts with the originating UE as usual to establish the dialog. The Media Server Control AS interacts with the MRCF using a third party control model, as defined in IETF RFC 3264.

The Media Server Control AS requests trans-coding facilities from the MRCF (**1720**). The request includes the appropriate trans-coding requirements and resources to be established. A separate dialog is established from the Media Server Control AS to the MRCF for the PA client.

The offer/answer model is used for SDP negotiation between the Media Server Control AS/S-CSCF and the MRCF.

The MRCF should always grant the requests from the AS (unless there is a resource problem). The MRCF responds to the INVITE request (**1721**, **1722**) with a 200 response indicating the selected codec in the SDP (**1723**, **1724**). The MRCF will also reserve the requested local resources at that time.

The media from the PA UE is connected at the trans-coding resource at the Media Resource Function Processor (MRFP).

The selected codec is included by the Media Server Control AS in the 183 response to the UE. (not on Fig.)

The receipt of the ACK at the MRCF (**1725**, **1726**) triggers the start of the trans-coding session (**1727-1730**).

It will be further appreciated that the scope of the present invention is not limited to the above-described embodiments but rather is defined by the appended claims, and that these claims will encompass modifications and improvements to what has been described.

What is claimed:

**1**. A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, comprising the acts of:

provisioning a serving node in the *wide area* network with control point (CP) logic that includes logic to negotiate media content delivery with at least one of the MS and the MR, wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the CP logic resides in the signaling domain and serves as a first proxy;

provisioning the UE of the *wide area* network with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with CP logic to negotiate media content delivery between the MS and the MR, and (iii) video cassette recorder (VCR) controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a second proxy;

in response to a media content delivery request, determining a network context of the UE and a network connectivity of the MS and MR;

invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR if one of the MS and MR are not in communication with the UE via a local wireless network; and

once media content delivery is negotiated, controlling a presentation of delivery via the VCR controls on the UE.

**2**. The method of claim **1**, wherein the CPP logic is invoked to negotiate media content delivery between the MS and the MR if the MS and MR are both in communication with the UE via a local wireless network.

25

**3**. The method of claim **2**, wherein the local wireless network includes at least one a Wi-Fi network, a WiMax network, and a Bluetooth network.

**4**. The method of claim **1**, wherein the CP logic is invoked to negotiate media content delivery between the MS and the MR if neither the MS nor the MR are in communication with the UE via the local wireless network.

**5**. The method of claim **1**, wherein the UE is implemented on a handset.

**6**. The method of claim **5**, wherein the handset comprises a display, and the MR uses the display.

**7**. The method of claim **1**, wherein at least one of the MS and the MR is on a 3G network and in communication with the serving node.

**8**. The method of claim **1**, wherein the UE is in communication with the MR via a local wireless network.

**9**. The method of claim **1**, wherein the UE is in communication with both the MS and the MR via a local wireless network.

**10**. The method of claim **1**, wherein the CP logic negotiates service delivery from the MS, the MS being on a 3G network, the CPP logic in the UE negotiates delivery on the MR, and the CP logic and CPP logic execute synchronization logic to complete the negotiation of delivery from the MS to the MR.

**11**. The method of claim **1**, wherein the UE communicates its network context to the serving node and the serving node informs the UE of the serving node's capabilities for negotiation with devices local to the UE.

**12**. The method of claim **1**, wherein the CP logic is configured to serve multiple unrelated devices running CPP logic.

**13**. The method of claim **12**, wherein CPP logic is implemented in a UE resident in a handset and in a remote control device.

**14**. The method of claim **13**, wherein a user uses the CPP logic in the handset when the user is remote from the MR and uses the CPP logic in the remote control device when the user is local to the MR.

**15**. The method of claim **1**, wherein, if one of the MS and MR are remote from the UE, the CPP logic provides information about invoked VCR controls to the CP logic on the serving node to allow the CP logic to control the remote MS or MR.

**16**. The method of claim **1**, wherein the MS and the MR are in a digital home network.

**17**. The method of claim **1**, wherein the UE determines that it is local to at least one of the MS and the MR by using Universal Plug and Play (UPnP) protocols.

**18**. The method of claim **1**, wherein at least one of the MS and MR announce their presence to the UE using at least one of UPnP protocols, Jini technology, RFID, and Bluetooth.

**19**. The method of claim **1**, wherein the negotiation of media content delivery includes the negotiation of out-of-band media transfer between the MS and the MR.

*20. A method of controlling and delivering media content from a media server (MS) to a media renderer (MR) utilizing a wide area network for control, where a user endpoint (UE) is provisioned with control point proxy (CPP) logic that includes (i) logic to negotiate media content delivery with at least one of the MS and the MR, (ii) logic to cooperate with network control point (CP) logic to negotiate media content delivery between the MS and the MR, and (iii) video play controls to control a presentation of content provided by the MS and rendered by the MR, wherein the CPP logic resides in the UE and serves as a first proxy, comprising the acts of:*

*provisioning a serving node in the wide area network with control point (CP) logic that includes logic to negotiate*

26

*media content delivery with at least one of the MS and the MR, wherein the CP logic, MS, and MR resides outside of a user endpoint (UE) and the CP logic resides in the signaling domain and serves as a second proxy;*

*in response to a media content delivery request, the wide area network determining a network context of the UE and a network connectivity of the MS and MR;*

*invoking the CPP logic and the CP logic to cooperatively negotiate media content delivery between the MS and the MR if one of the MS and the MR are not in communication with the UE via a local wireless network; and*

*once media content delivery is negotiated, receiving video play controls from the UE.*

*21. The method of claim 20, wherein the CPP logic is invoked to negotiate media content delivery between the MS and the MR if the MS and MR are both in communication with the UE via a local wireless network.*

*22. The method of claim 21, wherein the local wireless network includes at least one a wi-fi network, a wimax network, and a Bluetooth network.*

*23. The method of claim 20, wherein the CP logic is invoked to negotiate media content delivery between the MS and the MR if neither the MS nor the MR are in communication with the UE via the local wireless network.*

*24. The method of claim 20, wherein the MS and the MR are in a digital home network.*

*25. The method of claim 20, wherein at least one of the MS and MR announce their presence to the UE using at least one of UPnP protocols, Jini technology, RFID, and Bluetooth.*

*26. The method of claim 20, wherein the negotiation of media content delivery includes the negotiation of out-of-band media transfer between the MS and the MR.*

*27. A user endpoint (UE) for communication with a serving node in a network, the serving node having control point (CP) logic that includes logic to negotiate media content delivery with at least one of a media server (MS) and a media renderer (MR), wherein the CP logic, MS, and MR reside outside of the UE and the CP logic resides in the signaling domain and serves as a first proxy, the UE comprising:*

*a transceiver to communicate with the network, the MS and the MR; and*

*a computer readable medium comprising:*

*personal agent logic configured to determine a network context of the UE; and*

*control point proxy logic configured to:*

*negotiate media content delivery with at least one of the MS and the MR,*

*cooperate with the serving node CP logic to negotiate media content delivery between the MS and the MR, and*

*once media content delivery is negotiated, control a presentation of media content provided by the MS and rendered by the MR with video play controls.*

*28. The UE of claim 27 comprising a display, and the MR uses the display.*

*29. The UE of claim 27, wherein the UE is in communication with one or more of the MS and the MR via a local wireless network.*

*30. The UE of claim 29, wherein the local wireless network includes at least one a wi-fi network, a wimax network, and a Bluetooth network.*

*31. The UE of claim 27, wherein the UE determines that it is local to at least one of the MS and the MR by using universal plug and play (UPnP) protocols.*

US RE44,412 E

**27**

**28**

*32. The UE of claim 27, wherein the UE communicates its network context to the serving node and receives from the serving node the serving node's capabilities for negotiation with devices local to the UE.*

*33. The UE of claim 27, wherein the UE is implemented on a handset.*

\* \* \* \* \*

# United States Court of Appeals
## for the Federal Circuit
*Aylus Networks, Inc. v. Apple Inc.*, 2016-1599

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by QUINN EMANUEL URQUHART & SULLIVAN, LLP, counsel for Appellant to print this document.  I am an employee of Counsel Press.

On **May 23, 2016** counsel has authorized me to electronically file the foregoing **Appellant's Opening Brief (confidential and non-confidential versions)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Mark D. Fowler (Principal Counsel)
Robert Buergi
Christine K. Corbett
Erik Ryan Fuehrer
DLA Piper US LLP
2000 University Avenue
East Palo Alto, CA 94303-2248
650-833-2048
mark.fowler@dlapiper.com
robert.buergi@dlapiper.com
christine.corbett@dlapiper.com
erik.fuehrer@dlapiper.com

Stanley Joseph Panikowski, III,
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619-699-2700
stanley.panikowski@dlapiper.com

Additionally, the confidential brief will be emailed to the above counsel and two paper copies will also be mailed to the above principal counsel on this date.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

May 23, 2016                                         /s/ Robyn Cocho
                                                     Counsel Press

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. Proc. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this brief includes 8,926 words.

2.    This brief has been prepared in proportionally spaced typeface using Microsoft Word 2013 in 14 point Times New Roman font.  As permitted by Fed. R. App. Proc. 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certification.

Dated:  May 23, 2016

*/s/ Amar L. Thakur*
Amar L. Thakur
QUINN EMANUEL URQUHART &
SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
amarthakur@quinnemanuel.com

*Attorneys for Appellant Aylus Networks, Inc.*